## UNITED STATES DISTRICT COURT
## OF THE MIDDLE DISTRICT OF FLORIDA

**Case No.: _____**

HOPE MCMATH,

    Plaintiff,

v.

DUVAL COUNTY PUBLIC SCHOOLS,
CHARLOTTE JOYCE, APRIL CARNEY, MELODY
BOLDUC, REGINALD BLOUNT and ANTHONY
RICARDO, FLORIDA DEPARTMENT OF EDUCATION
and ANASTASIOS KAMOUTSAS, AS COMMISIONER
OF EDUCATION, MOMS FOR LIBERTY INC, and
MOMS FOR LIBERTY - DUVAL,

    Defendants.

_____/

## COMPLAINT FOR DAMAGES, EQUITABLE RELIEF AND DEMAND FOR JURY TRIAL

    COMES NOW the Plaintiff, HOPE MCMATH, by and through her undersigned counsel, and files this Complaint for Damages and Equitable Relief against DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, the FLORIDA DEPARTMENT OF EDUCATION and its COMMISSIONER, ANASTASIOS KAMOUTSAS, as well as MOMS FOR LIBERTY INC. and MOMS FOR LIBERTY - DUVAL (all collectively referred to herein at "Defendants"), and alleges as follows:

1

## JURISDICTION AND VENUE

1.      Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, seeking damages, declaratory and injunctive relief against the government Defendants for their violation of Plaintiff's First and Fourteenth Amendment rights.

2.      42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

3.      42 U.S.C. § 1983 permits the recovery of damages—that is, monetary relief—against a state or local official whose conduct results in a deprivation of rights "secured by the Constitution."

4.      This Complaint seeks damages and relief against Duval County Public Schools and the Department of Education, as well as members of the school board of Duval County Public Schools and Commissioner of the Department of Education, as these Defendants violated clearly established Federal and Constitutional rights of which a reasonable person would have known. As such, this honorable Court is proper.

5.     This Complaint further seeks damages which are inextricably intertwined with the actions of Moms for Liberty and Moms For Liberty – Duval, as complainant. While not state entities, they are in some way managed, run or have significant influence on the individual Defendants herein.

6.     This action further seeks a judicial determination of issues, rights, and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain policies and practices of Defendant and its leadership (including but not limited to school board members wearing partisan clothing on the dais while doing DCPS business, elevating one side of political speech over another, allowing extra time to a preferred viewpoint, allowing extra protection or rule breaking based on viewpoint, calling speakers evil and violent while calling others martyrs or brave and more).

7.     There are additional substantial *bona fide* doubts, disputes, and questions which must be resolved concerning Defendants' actions taken under color and authority of state law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

8.     This Complaint seeks damages, declaratory and injunctive relief to prevent further violations of the Plaintiff's rights, privileges, and immunities under the Constitution of the United States and 42 U.S.C. §1983 and §1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation,

custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

9.      The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. § 2201 and §2202, and Rule 65 of the Federal Rules of Civil Procedure.

10.      The Court may enter an award of attorney's fees pursuant to 42 U.S.C. § 1988.

11.      Venue is proper in the Northern District of Florida, Jacksonville Division, since all parties are situated in Jacksonville, and all of the actions complained of occurred within the district and geographical area assigned to the Jacksonville Division.

## THE PARTIES

12.      Plaintiff is Hope McMath, a resident of and educator in Duval County, Florida.

13.      At all material times prior to her exercise of protected speech, the Plaintiff was employed by Douglas Anderson School of the Arts, a Duval County Public School, in Jacksonville, Florida, where she has taught AP Art History students since 2024.

14.    Moms for Liberty, Inc, a 501(c)(4) is a Florida organization, whose self-described mission, "is to organize, educate and empower parents to defend their parental rights at all levels of government." It operates in Jacksonville, Duval County, Florida. They are made up of members, advocates and decisionmakers, which are otherwise government employees named herein.

15.    Moms for Liberty – Duval County, is apparently a separate branch or chapter of the 501(c)(4) organization. It operates in Jacksonville, Duval County, Florida.

16.    Defendant Duval County Public Schools ("DCPS") is a school district that operates the public schools of Duval County, Florida. DCPS is managed by an elected seven-member board.

17.    Defendant Charlotte Joyce (hereinafter "Joyce" or "Ms. Joyce") is the Chair of the Duval County School Board.

a.    Ms. Joyce signed a pledge to Moms for Liberty on November 3, 2022.[1]

b.    Ms. Joyce was endorsed by Moms for Liberty.

c.    Ms. Joyce wore a Turning Point t-shirt on the dais doing official School Board Business.[2]

---

[1] https://portal.momsforliberty.org/files/3031/
[2] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

d.  Ms. Joyce has openly advocated for both Moms for Liberty and Turning Point's agenda from DCPS's dais and across her professional and personal life.

e.  Ms. Joyce has specifically censured and referenced Ms. McMath's speech and alleged misconduct during school board meetings, as well as on her personal time.

18.  Defendant April Carney (hereinafter "Carney" or Ms. Carney") is the Vice Chair of the Duval County School Board.

a.  Ms. Carney signed a pledge to Moms for Liberty on October 4, 2022.[3]

b.  Ms. Carney is on record as being a "member" of Moms for Liberty.[4]

c.  Carney touted the endorsement of Moms for Liberty on her website.[5]

d.  Carney wore a Turning Point t-shirt on the dais doing official School Board Business.[6]

e.  Ms. Carney has openly advocated for both Moms for Liberty and Turning Point's agenda from DCPS's dais and across her professional and personal life.

---

[3] https://portal.momsforliberty.org/files/2977/
[4] https://floridapolitics.com/archives/666984-jacksonville-bolf-for-3-27-24-april-carneys-confessional/
[5] https://web.archive.org/web/20230605195026/https://aprilcarney.com/
[6] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

f.    Ms. Carney has specifically censured and referenced Ms. McMath's speech and alleged misconduct during school board meetings, as well as on her personal time.

19.    Defendant Melody Bolduc (hereinafter "Bolduc" or Ms. Bolduc") is a member of the Duval County School Board.

a.    Bolduc's official campaign website listed her as a "member" of Moms for Liberty.[7]

b.    Moms for Liberty notes Bolduc was endorsed by it.[8]

c.    Bolduc wore a Turning Point t-shirt on DCPS's dais doing official School Board Business.[9]

16.    Defendant Anthony Ricardo is a member of Duval County School Board. He is sued in her official and individual capacities.

a.    Moms for Liberty notes Ricardo was endorsed by it.[10]

b.    Ricardo wore a Turning Point t-shirt on DCPS's dais while doing official School Board Business.[11]

---

[7] https://web.archive.org/web/20240322085936/https://www.melodybolduc.com/

[8] https://portal.momsforliberty.org/news/duval-school-board-2-moms-for-libertyendorsed-candidates-win/

[9] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

[10] https://portal.momsforliberty.org/news/duval-school-board-2-moms-for-libertyendorsed-candidates-win/

[11] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

20.    Defendant the Department of Education ("FDOE") is a department within Florida government, led by a seven-member board which oversees all of Florida's public-school districts.

21.    Defendant Anastasios Kamoutsas is the appointed Commissioner of the Florida Department of Education. He has instituted disciplinary proceedings against McMath, spoke out against her and others and otherwise spoken from Moms for Liberty's stage noting a war against a liberal, woke agenda and also noting he will do everything within his power to protect Turning Point USA in schools.

## COLOR OF STATE LAW

22.    Except for the Moms for Liberty Defendants, all Defendants are public officials and officials of a state agency and are acting under color of state law and authority.

23.    Except for the Moms for Liberty Defendants, Defendants' actions as alleged herein were all taken under color of state law, violate Plaintiff's constitutional rights to engage in free speech and otherwise present harm to Plaintiff and other's Constitutional Rights.

## HOPE MCMATH

24.    The Plaintiff is an educator at Douglas Anderson School of the Arts, a Duval County Public School, in Jacksonville, Florida. She holds a teaching

certificate with the State of Florida, which the Defendant Department of Education seeks to revoke.

25.    Hope McMath was unfairly targeted as part of a larger campaign which targeted similarly situated teachers across the county over protected speech found disagreeable to this political non-profit and government leaders after the murder of Turning Point USA's founder, Charlie Kirk.

26.    Ms. McMath posted protected political speech on her time on her personal social media (Facebook and/or Instagram), which subjected her to persecution by Defendants.

27.    Ms. McMath's statements were in no way affiliated with her job as a part-time educator.

28.    Ms. McMath has never promoted her social media to students. In fact, McMath routinely told / tells her students they were / are not allowed to engage with her on social media.

29.    McMath routinely blocks any identified students (and their identifiable parents) who like, comment, follow or friend her personal social media pages.

30.    Ms. McMath was one of many educators across Florida who were persecuted solely for the content of their speech. Ms. McMath has been on administrative leave and unable to teach her AP Art History students.

31.    There is no allegation or evidence that Ms. McMath was removed from her classes or disciplined for anything which happened in the classroom, on school property or using school resources.

32.    Instead, DCPS and FDOE disciplined McMath after Moms for Liberty weaponized a complaint against her and the Department of Education is prosecuting her solely related to speech they openly say is disagreeable.

33.    At a nearly two-hour meeting with Duval County Public School officials, it was revealed that there were no complaints, investigations or reports by any student, parent, fellow teacher or administrator in any way associated with Ms. McMath.

34.    Stated alternatively, there is no known student of Ms. McMath who claims, or has claimed, they were harmed, subjected to political viewpoints or accessed or were influenced by her political opinions. There is no improper conduct, victimization, crime or claim in any classroom or schoolhouse whatsoever.

35.    Ms. McMath has been removed from her classroom and school for months as a sole result of a political group (and its allies) at war with its perceived political "liberal" opponents.

36.    Instead of teaching, McMath was initially relegated to a distant warehouse known as "Bull's Bay," which can only be described as purgatory for

teachers. They have limited access to other humans, are given mundane tasks and/or simply sleep all day. It was horrible on McMath's mental health.

37.     Ms. McMath was recently reassigned to assist with framing student art and other tasks, but can get no timeline or answers from the Defendants.

38.     Duval County Public Schools and the Florida Department of Education refuse to respond to requests for any and all complaints or supporting information which led to her investigation.

39.     Ms. McMath faces revocation of her ability to educate as a spoil of the war she has not in any way warranted.

## **CHARLIE KIRK**

40.     This lawsuit (and ones like it) stem from the aftermath of the tragic shooting of Charles James "Charlie" Kirk (hereinafter, "Mr. Kirk" or "Kirk").

41.     Mr. Kirk was born on October 14, 1993. Until his death on September 10, 2025, Kirk was known as a political activist, entrepreneur, and media personality.

42.     Kirk co-founded the conservative student organization Turning Point USA (hereinafter, "TPUSA") in 2012 and published a range of very right-leaning books and hosted the podcast *The Charlie Kirk Show*.

43.    Kirk also hosted a question-and-answer tour across America where moderators would choose people out of the audience to debate Kirk, often leading to viral moments posted to the internet.

44.    Based largely on campus tour clips and podcast excerpts, Kirk rose to prominence, particularly in the Republican Party. Mr. Kirk was unquestionably a political figure, celebrity and sought out and platformed divisive stances which led to tremendous fame.

45.    Kirk's publications platformed sensational and divisive statements, which put many Americans at odds with each other. Many Americans were cast off as evil or seeking war, while others are told they must fight for their lives and religious salvation at any and all cost.

46.    Kirk even addressed the correlation of violence and political speech, saying, "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational." This was said at an event organized by TPUSA Faith, the religious arm of Kirk's conservative group Turning Point USA, on April 5, 2023.

47.    After Kirk's death, some praised him. Others posted clips and took more disagreeable stances.

## CHARLIE KIRK: A MATTER OF PUBLIC CONCERN

48.     After his assassination, many Americans were outraged that Kirk was receiving praise without mention of his controversial, if not discriminatory, statements.

49.     Some wanted to censure all criticism of Charlie Kirk out of respect for his life. Others felt a personal obligation to keep his statements in a context they felt was being manipulated. This is all protected speech. The pendulum of the First Amendment protects both sides.

50.     Many of the criticisms and contextualizations were about Kirk's public statements on race. About African Americans, Kirk used statements like, "(P)rowling Blacks go around for fun to go target white people, that's a fact. It's happening more often."

51.     Also, on *The Charlie Kirk Show,* on May 19, 2023, Kirk used racially triggering and inciteful words like, "thugs," and said repeatedly he wanted to see an end to, "a pattern of blacks prowling the streets… (who) feel untouchable."

52.     Kirk explained, "social justice warrior simulation theory" in such an inflammatory way as to blame those who seek justice as conditioning Americans to, "take the black person's side over the white person."

53.     At one point on the May 19, 2023, edition of *The Charlie Kirk Show,* Kirk feigned surprise by a statistic cited by his producer, but then emphasized the

information, saying, "more than 600 white women a year are murdered by black men." These stats have been highly criticized by media.[12] All too often, no source was cited for the statistics Mr. Kirk used to engage and enrage.

54.    Other controversial rants by Kirk include statements like, "MLK was awful. He's not a good person." And, "If I see a Black pilot, I'm going to be like, boy, I hope he's qualified." And, "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"

55.    Kirk further noted an example involving a Hispanic man murdering a white woman and noted it didn't fit his rant, so he added, "well, he might have been half-black." He then noted the assailant was, "trans." This seems to be referring to the murder of Lauren Heike, who was allegedly murdered by Zion William Teasley. Teasley's trial will not occur for years and discovery in the case has not been made public. Social media has leaked false details, as it does daily. The Arrest Report and Criminal Indictment note Teasley served in the military, had a history of harassing and stalking women and matches surveillance footage from the scene.[13] No mention is made of any racial or gender orientation involvement whatsoever, other than the fact he had internal struggle with his own sexuality… "as a Christian." Police note Teasley

---

[12] See https://www.reuters.com/article/world/fact-check-false-data-on-us-racial-murder-rates-idUSKCN24I29S.
[13] https://www.documentcloud.org/documents/23820675-zion-william-teasley-probable-cause-afffidavit-and-indictment/.

said he was concerned for his "salvation of his soul due to his thoughts." To some, Kirk regularly demeaned, debased and engaged in dangerous transphobic rhetoric, which they found abhorrent.

56.    Kirk also spoke against, "the decline of American men" and blamed it on the LGBTQ movement, including noting, America should "just take care of" transgender people, "the way we used to take care of things in the 1950s and 60s."

57.    In the 1950's and 1960's, transgender people faced abuse, beatings, forced psychological intervention, severe persecution through laws against cross-dressing, police harassment, employment discrimination and physical attack.

58.    Kirk told popular singer Taylor Swift and her NFL husband Travis Kelce, "Reject feminism. Submit to your husband, Taylor. You're not in charge."

59.    Kirk once discussed the use of the term, "Karen," which he called a, "slur," noting, "liberal women are awful, they're trying to get us to accept disgusting behavior by exploiting our distaste for a subtype of white liberal woman. And they also just want to start a race war. The left would love to see a race war."[14]

60.    This very view has been adopted by Turning Point and Kirk supporters, as well as Moms for Liberty supporters to justify white liberal women as evil, harmful

---

[14] May 19, 2023 The Charlie Kirk Show. See https://www.mediamatters.org/charlie-kirk/charlie-kirk-goes-unhinged-racist-rant-prowling-blacks-go-around-fun-go-target-white.

to children and to be blamed for violence and the degradation of Christian values. It became and continued to be increasingly dangerous.

61.    Kirk juxtaposed his views and beliefs in Christianity with the need to hold those who believed or looked different as "less than," evil or enemies.

62.    About people of non-Christian faith, Kirk said, "Islam is not compatible with Western civilization." And, "Islam is the sword the left is using to slit the throat of America."

63.    Kirk also divided Americans further by political affiliation, saying things like, "The American Democrat party hates this country. They wanna see it collapse. They love it when America becomes less white."

64.    Kirk continuously called those who took stances in disagreement with him, "social media jihadis," an expression used in Islamic and Muslim traditions, which has come to be Americanized as an expression of war.

65.    Over and over, Kirk said people like Plaintiff, or other fellow suspended teachers, wanted to start a war. After his death, some who disagreed with Kirk were publicly remembering these comments and memorializing Kirk in their own way, by rejecting the view that he was a UNIVERSAL national hero or in any way spoke for EVERYONE.

66.    Social media algorithms fed this poison to the masses on each side to generate profits over people. To some, Kirk was a Christian crusader who stood up

for them. To others, Kirk was a symbol of white nationalism who persecuted those of different races, faiths, sexual orientation and beliefs. To all who felt strong in their beliefs, the pendulum of First Amendment was supposed to protect them.

67.    After his death, on September 12, 2025, clips of Kirk's own *bonafide* statements filled the internet, as people reposted his comments, such as, "blacks were better off under slavery."[15]

68.    Major news websites featured many of Kirk's soundbites on guns, race and more, as well has Kirk saying he wants to be remembered for the courage he had in his faith.[16]

69.    Ms. McMath is white, female and a registered Democrat.

70.    Ms. McMath is proudly vocal about matters of public concern in her personal life, specifically protecting those who need protection, which is commonly viewed as a "liberal" stance. So, she would fit the description of an "enemy" to Kirk and his followers.

71.    Dissent to Charlie Kirk, his teachings, his views and his opinions were never brought into the classroom by Ms. McMath in any way.

72.    Despite the harmful rhetoric, McMath never discussed any of her own political opinions in the classroom about Kirk, Turning Point, Mom for Liberty,

---

[15] See https://www.instagram.com/reel/DOcqXWzDMHn/?hl=en.
[16] https://www.instagram.com/reel/DOeymDdFXQ7/.

Donald Trump, the Make America Great Again movement, immigration, transgender issues or any other subjective opinion about politics. She taught the curriculum.

73.    Ms. McMath assuredly does not want to start any war, particularly a race war, but personally rejected Mr. Kirk's rhetoric.

74.    Ms. McMath knows no one who wants to start a "race war" or any type of war between fellow humans. She is not an enemy, not awful and has lived a purpose filled life standing up for herself and others.

75.    Ms. McMath posted a comment after Mr. Kirk's death about "karma" which garnered the attention of some, and eventually all, of the Defendants.

76.    Private and public officials universally started shaming, doxxing and then seeking to end the jobs, if not lives, of dissenting voices, including McMath.

77.    Death threats have caused people, including educators, to further go in hiding.

78.    Many of those individuals, including a vast number of educators, were immediately persecuted, shamed, doxed and punished solely due to the content of their opposing speech.

79.    In some instances, educator's names were added to a website called, "Charlie's Murderers." The original website was on a .com domain and was

removed. A resurrected version now exists on a .net domain. The domain literally listed people's contact information and employers for others to contact and complain. It is unknown if Plaintiff was listed.



80.     Meanwhile, Charlie Kirk always encouraged speech of all types and vociferously maintained speech should not be censured or persecuted by the government. On May 2, 2024, Kirk posted to the social media platform, "X" (formally known as Twitter), as follows, "Hate speech does not exist legally in America. There's ugly speech. There's gross speech. There's evil speech. And ALL of it is protected by the First Amendment. Keep America Free."



## MOMS FOR LIBERTY, INC.

81.    Duval County Public Schools told Ms. McMath the SOLE complainant in her case was Moms For Liberty, Inc., a 501(c)(4) political operation who has expressed political disagreement with Ms. McMath in the past.

82.    Moms for Liberty was founded in 2020 by conservative women in Florida and has quickly expanded its presence across the country.

83.    Moms for Liberty landed national media attention for its efforts — sometimes successful — to fight COVID safety measures in schools, ban books, limit discussion about race and LGBTQ identities and populate local school boards with conservatives.

84.    The Southern Poverty Law Center ("SPLC") placed Moms for Liberty on its list of anti-government extremist entities, drawing comparisons between them and parent groups that attempted to re-segregate public schools during the civil rights movement. "They really are seeking to undermine public education holistically and to divide communities," said Rachel Carroll Rivas, deputy director for research, reporting and analysis at the SPLC.[17]

85.    One example of the battle Moms for Liberty fought in courts was filed against the Tennessee Department of Education, alleging that a second-grade lesson

---

[17] https://www.npr.org/2023/06/07/1180486760/splc-moms-for-liberty-extremist-group

on "Civil Rights Heroes" violated Tennessee's K-12 Divisive Concepts Act. Moms for Liberty alleged that white children were made to feel discomfort upon seeing what history looked like. It further claimed that some children who experienced these lessons, "are seeing counselors to overcome the emotional trauma inflicted upon them by what they learned in Tennessee public education." Once such book was Frances E. Ruffin's book entitled, *Martin Luther King, Jr. and the March on Washington* (2001).

86.    When the enforcement of the laws did not go far or quickly enough, chapters of Moms for Liberty's New Hampshire chapter recruited people to make reports and said that it would pay $500 to the first person to successfully catch a teacher breaking the state's new anti-divisive-subject law.[18]



---

[18] https://www.businessinsider.com/anti-crt-moms-for-liberty-teachers-breaking-new-discrimination-law-2021-11

87.    It is unknown what, if any, bounties were offered, promised or paid related to Ms. McMath or other teachers.

88.    It is also unknown what, if any, quid pro quo, endorsements, donations or allowance of public officials to be promoted on its stage or social media is tied to those government officials promoting their agenda or prosecuting their complaints.

89.    It is beyond a slippery slope when secret payments are being used to target educators and there are such ties between government officials and a powerful political non-profit.

90.    As more money was spent defending against Moms for Liberty lawsuits, school districts often caved or settled the claims.

91.    The United States Department of Education responded with guidance for educators and administrators, assuring, "The Department of Education's (Department's) Office for Civil Rights (OCR) provides this fact sheet to assist school communities, including students, parents, families, educators, and elementary, secondary, and postsecondary educational institutions, in understanding that diversity, equity, and inclusion training and similar activities in most factual circumstances *are* consistent with Title VI of the Civil Rights Act of 1964 (Title VI)."

92.    Further, the United States Department of Education noted, "Nor do these activities categorically create a hostile environment on the basis of race."

93.    Moms for Liberty has extended its efforts from removing books they did not like to removing teachers who don't agree with their views.

94.    To quote a prior Complaint filed in Florida by Defendant Moms For Liberty, Inc., "(The) County's public schools doubtless teach students that the U.S. Constitution protects their freedom of speech and their right to petition the government for redress of grievances."[19]

95.    Moms for Liberty further stated, "Plaintiffs object to the unlawful restrictions that (the) school board places on First Amendment rights. The school board restricts what people can say and to whom they can say it, and discriminates against viewpoints critical of the board. The school board's policies unconstitutionally chill the speech of some and unlawfully control the content of others, discriminating on the basis of viewpoint."[20]

96.    This lawsuit mirrors many of the Defendant's own prior lawsuits, which have resulted in school systems paying damages and attorney's fees all over the country. Further, DCPS has directly lifted some political speech up while giving the opposite less time while literally wearing the -t-shirts of the message they support. It's beyond stifling and the slope is not slippery, it's a cliff.

---

[19] See Complaint in Moms for Liberty- Brevard County versus Brevard Public Schools, Case 6:21-cv-01849-RBD-RMN).
[20] Id.

97.    Moms for Liberty has indicated they are not going to stop their advocacy until their views are entirely integrated on all American children.

98.    Many of those children will suffer great harm, especially those who are not while, Christian, and/or gender-conforming children. Moms for Liberty itself justifies their efforts and calls it a war on values.

99.    In the apt words of Kurt Vonnegut, a champion of free speech and the author of the banned book *Slaughterhouse-Five*:

> If you are an American, you must allow all ideas to circulate freely in your community, not merely your own . . . [I]t was a rotten lesson you taught young people in a free society when you denounced and then burned books books you hadn't even read. You should also resolve to expose your children to all sorts of opinions and information, in order that they will be better equipped to make decisions and to survive."

100.    Moms For Liberty, Inc.'s viewpoints are directly adjacent to Mr. Kirk's stances on Christianity, LGBTQ, vaccinations, book censorship and other politically divisive issues.

101.    Recently, turningpointsmemo.com posted a story, "At Moms for Liberty Summit, Parents are Urged to Turn their Grievances Into Lawsuits."[21]

102.    The favorably written article, promoted Moms for Liberty's national summit in Orlando, Florida there was a new mission statement, indicating, "Where

---

[21] https://talkingpointsmemo.com/news/at-moms-for-liberty-summit-parents-are-urged-to-turn-their-grievances-into-lawsuits

past Moms for Liberty attendees were urged to run for school board, this year they were encouraged to turn their grievances into legal challenges."

103.  In many ways, Turning Point and Moms For Liberty share platforms, agenda and aggressive intent to restore and reshape schools, and American society based on their shared beliefs.

104.  In fact, upon the death of Kirk, Moms For Liberty's co-founder noted, "The work we are called to do at Moms for Liberty is the same work that Charlie Kirk and our friends at Turning Point USA have poured their lives into for more than a decade. We have always been united in this purpose and mission: to preserve America for future generations."[22]

105.  Moms For Liberty further noted, "Evil showed up to battle yesterday. But evil **WILL NOT WIN** this war. **Put on your armor, moms!** Stand with courage and love. Fasten your belt of truth and the breastplate of righteousness. These are the tools we will use to overcome it." (emphasis in original). Id.

106.  Indeed, Moms For Liberty consistently uses / used terms of war and division to case their believers as righteous and the other side as evil.

---

[22] https://portal.momsforliberty.org/news/our-friend-charlie-kirk/

107.   Moms for Liberty's CEO and founder, Tina Desocvich, noted Moms for Liberty and its members needed to, "shake off the shackles of fear and stand for truth or we are going to lose Western civilization as a whole."

108.   Moms for Liberty's stated goal was to "infuse their values into schools."

109.   Florida's Attorney General, James Uthmeier, appeared at the convention and spoke from the state's perspective, "If you're identifying one of these wrongs that's violating your rights and then subjecting **our** kids to danger and evil, then we want to know about it," he said. "And we're going to bring the heat in court to shut it down."

## **MOMS FOR LIBERTY FOR ANASTASIOS KAMOUTSAS**

110.   Anastasios Kamoutsas leads the Department of Education. He wrote the letter seeking sanctions and initiating legal proceedings against McMath. This is attached as Exhibit "A."

111.   Kamoutsas has been a lawyer in this state since 2014, so one would assume has a foundational understanding of the U.S. Constitution and Bill of Rights.

112.   Moms for Liberty's influence extends directly to Department of Education Commissioner Anastasios Kamoutsas. He recently spoke to their membership, which was promoted in advance and later archived by the group.



113.   Commissioner Kamoutsas knows what the First Amendment is. In fact,

he criticized School Board of Alachua County Chairperson Sarah Rockwell,

claiming she violated a speaker's constitutional rights, saying in his letter, "After a

parent expressed his protected opinion under the First Amendment, you sat idly by

while the police were directed to escort this parent out of the school board meeting for expressing a conservative viewpoint." Note- it was a conservative viewpoint.

114.    Commissioner Kamoutsas went further, publicly saying, "You should be ashamed of your failure as a board member, let alone the board chair," And, "I think it's time for some reflection on whether you are properly equipped to serve."

115.    Incidentally, in the subject incident, Rockwell used social media in her private life to criticize a presenter at the Republican National Convention, who passed away, saying in a later deleted Facebook post, "Oh, did Hulk (Hogan) die? I didn't even know. Good. One less MAGA in the world." This had nothing to do with the school board meeting, but it kept coming up from her fellow board members and public comment, despite her apology.

116.    The crowd loudly argued after public commenter Jeremy Clepper said Rockwell should step down if she has a "shred of integrity in her body," later calling her a "disgusting, vile human being."  According to witnesses, Clepper then, "(Got) in the face of Rockwell, start(ed) yelling at her, start(ed) pointing his finger at her, and that's the point when I started recording."

117.  Meyer's video  of  the  incident shows  five  uniformed  officers surrounding Clepper, who stood within a few feet of the dais.

118.    Kamoutsas wrote in the Aug. 1 letter. "Not only did you allow a parent's constitutional rights to be violated under your leadership, but the rest of the board stood by silently, failing to stop it."

119.    "Everyone who requested to speak at the School Board meeting was able to do so," according to ACPS spokesperson Jackie Johnson. "Regardless of their expressed viewpoint, no one was required to leave the meeting. It is our belief that everyone's First Amendment rights were upheld."

120.    A search of TikTok clips of Kamoutsas' excerpts reveal an obvious pro Charlie Kirk agenda. In one clip easily verified to be real, Kamoutsas says in front of his former boss, Governor Ron Desantis, "Let me be very clear… If you haven't received the message already," if you in any way get in the way of a teacher or student trying to start a Turning point chapter, you will be met with the full force of the law."[23]

121.    The Teacher Freedom Summit was held by the Teacher's Freedom Alliance shortly after Kamoutsas took the job. The CEO described it, as follows: "At the Teacher Freedom Alliance, we're giving educators real freedom, freedom from the liberal, woke agenda that has corrupted public education," And, "We will arm

---

[23]

https://www.tiktok.com/@yourrepublicanmom/video/7566016235708714270?q=Kamoutsas&t=1761782989436

teachers with the tools, support, and freedom they need, without forcing them to give up their values. This is a battle for the future of our kids, and we will not lose."[24]

122.   Kamoutsas spoke how aligned he was with the Teacher Freedom Summit's mission. He said they all needed to "fight back" against adverse political voices, expressed his alignment with Christian values and anti-Democrat stances.

123.   At Moms for Liberty's own seminar, Kamoutsas was on the panel with Kate Anderson from Alliance Defending Freedom and Sarah Parshall Perry from Defending Education. He thanked prominent members of Moms for Liberty, who he has worked with on issues pushing their agenda.

124.   Once again, Moms for Liberty is a partisan entity focused on fighting a "liberal, woke agenda" instead of non-partisan education.

125.   During Kamoutsas' speech, he namedrops Tiffany Justice, the Co-Founder of Moms for Liberty while also focusing in on hot button issues that Moms for Liberty prioritizes. He brags about the rankings by the Heritage Foundation, ALEC and other far right entities.

126.   At the question-and-answer session of the Teacher Freedom Summit, a Republican teacher calls Florida under the DeSantis administration Kamoutsas led as a "beacon of hope." The teacher asks if Kamoutsas will look to Trump to help or

---

[24] https://www.facebook.com/watch/?v=881908554407894

to spread Florida's legacy to "blue states." Kamoutsas "thanks God" for a U.S. Supreme Court decision upholding parental rights in education.

127.  Kamoutsas insults the "all inclusive" bathroom options at the Washington, DC based conference. And said thankfully in Florida, "women are women and men are men. We don't mix that up."

128.  Kamoutsas also discusses "religious objections" to pronouns usage. He told the crowd, "forgive me" about my religious views, which would make folks in Denver or California "explode."

129.  Kamoutsas then refers to himself as a "Bible thumper" and name drops more religious think tanks.

130.   Kamoutsas says, "After the immediate aftermath of the assassination of Charlie Kirk, I was appalled by what I was seeing educators post publicly. We have a teacher in Clay County, Florida, who posted when Charlie Kirk was assassinated at a school campus that, 'this wasn't the obituary I was hoping for, but it's a close second for me,' insinuating that the teacher actually wanted the President of the United States to be the individual who had been assassinated. Glorifying, celebrating, condoning a school shooting is not going to be tolerated in Florida. We do anticipate additional litigation as we fight back on this, but we're not afraid of it because we've done it before and we are going to always put students first in the state and we're going to lead by example."

131.   As Kamoutsas is in the role of Prosecutor here, his comments are professionally inappropriate. He is mixing his personal beliefs and prosecuting them inappropriately under the Constitution and laws of the country and state of Florida.

132.   Kamoutsas is unquestionably biased and exercising unconstitutional use of authority.

133.   The justice system has to remain as it was created- calm, equal and balanced. It must steer clear of rhetoric and avoid being led by political polarization in an increasingly polarizing world.

134.   In his 1838 speech, delivered to the Young Men's Lyceum of Springfield, Abraham Lincoln warned against mob rule and advocated for reverence for the law as the remedy for a nation increasingly prone to lawlessness. He said, "Let reverence for the laws, be breathed by every American mother... let it be taught in schools... and enforced in courts of justice. And, in short, let it become the political religion of the nation."

## <u>DUVAL COUNTY PUBLIC SCHOOLS</u>

135.   Duval County Public Schools (hereinafter "DCPS" or "Duval Schools") oversees over 100,000 students in and around Jacksonville, Duval County, Florida.

136.   Approximately 42% of those students are African American. 8% are Hispanic, 12% are identified as other and 29% are identified as "white."

137.   These students are spread across approximately 208 schools.

138.   In recent years, the Jacksonville Public Education Fund and DCPS noted, "In an analysis of three years of data from the school district, Jacksonville Public Education Fund revealed that Duval County's teacher retention rate is about 84 percent year-to-year across the entire district and about 75 percent year-to-year in the average school."[25]

139.   The study also noted, "statistics show that in Jacksonville, Black teachers make up about 29 percent of total teachers while Black students make up about 45 percent of total students. And Black male teachers make up less than 6 percent of the teacher workforce."[26]

140.   Duval County Public Schools is led by a seven-member board.

141.   The majority (four) of those seven members are members of, made a pledge to, or were endorsed by Moms for Liberty.

---

[25] https://eu.jacksonville.com/story/news/education/2021/02/23/new-research-highlights-teacher-retention-inequity-duval-schools/4556199001/
[26] Id.

142.   At a recent school board meeting, each and every one of those four endorsed members wore shirts emblazoned with, "This is the turning point."[27]

143.   These shirts were allegedly homemade, but features intellectual property of Turning Point USA, Inc., the very entity founded by Charlie Kirk.

144.   The chairwoman of the Duval County School Board Charlotte Joyce smiles displaying her shirt here:



145.   87.    Turning Point USA, Inc., also has sought trademarks for, "PLAYING OFFENSE TO WIN THE CULTURE WAR," "A BATTLE TANK, NOT A THINK TANK, "HEALING A SICK CULTURE," and, "WE ARE DOING THE WORK TO SAVE AMERICA." Like Moms For Liberty, Kirk and his TPUSA organizations consistently use / used terms of war and division to case their believers as righteous and the other side as evil.

---

[27] https://www.firstcoastnews.com/article/news/local/duval-county-school-board-members-turning-point-usa-shirts-backlash/77-815d45ef-11dd-4a65-a755-fa61c3d7b81c

146. By no means are these universal, apolitical or unitary taglines. They are intentionally divisive phrases based around one side claiming a moral high ground while insisting the other is starting a war, is immoral and full of sin.

147. At the school board meeting on October 7, 2025, Ms. Joyce failed to acknowledge the clear promotion of "Turning Point" until she was questioned about it during public comment, over an hour into the meeting.

148. The October 7, 2025 school board meeting had 76 speakers requesting to be heard. Because of the vast number of applicants, each was limited to <u>one minute</u>.

149. The speakers continued the tone of division and ridicule of speech they did not agree with:

a. One of the first speakers, Josh Nathanson, praised the Board leadership, accused the minority members of the board of misconduct and asked, "How did this person get hired?" and, "Is a teacher excusing an assassination as karma fit to teach in our schools." Nathanson and/or his spouse are Moms for Liberty members and campaign for their platform in a school board race.

b. A few speakers later, Blake Harper, brings up that he plans to exercise his "Constitutional Right of Individual Speech." Mr. Harper noted, "when you are employed by a company, you accept their rules and regulations. You don't get to

make your own. And that is exactly what Hope McMath thinks she can do." His comments were cut off due to time constraints, as he planned to explain how Ms. McMath did not have the same Rights he enjoyed. Harper has previously harassed and doxed McMath, including using her image on derogatory flyers.

      c.    Michele Matisue said her husband was a military test pilot and a leader and a teacher must also similarly exercise discipline and leadership, and added, "if a teacher is going to make very incendiary comments, and things that are dangerous, and students are affected by that, that is something to consider as to whether that person should be leading children when their minds and education are malleable and they are learning. So, I appreciate you taking a thorough investigation and I am praying for each one of you as you make this decision."

      d.    Joey Marmo started with, "What if I came up here and started making threats? What would happen to me?" And, added, "Think about how callous, cold hearted and empty you must be to wish ill and death upon another human being. That's not free speech, that is bloodless murder." Mr. Marmo noted the $30,000 a year in taxes he pays, "to fund these animals teaching our children." And, "I want these sick lefty sickos defending this teacher to be reminded Charlie (Kirk) was a father…." And, "The biggest crime to me is sickos like this teacher keeping her job after making sick deranged comments regarding the death of Charlie Kirk." He then quotes Jesus, says, "I am Charlie Kirk" and "fire her."

e.    James Crundon says he is "all for free speech," but then says if someone says something, "as out of step as this is… they don't need to be teaching children."

f.    At that point, people were allowed to defend Ms. McMath. Rachel Grage noted the hypocrisy and ethical concerns of the school board members wearing Turning Point shirts. Others joined her subsequently. For instance, Nancy Murray Settle indicated she was "stunned by the t-shirts" and expressed it was "amazing," but also noted Ms. McMath's First Amendment Rights were under assault and she should be reinstated.

g.    Gordon Terry resumed the persecution of Ms. McMath by reading scripture and called those on the other side of him, "evil folk." Mr. Terry is known for placing political signs for staunch Republican candidates.

h.    Many took the side of free speech and McMath as the night progressed, but Mark Stewart noted the key issues. One side is calling the others, including people like him "evil," an "animal" and an "enemy." He noted the *Caggione* case and said, "We need to be listening to people and our neighbors are not the enemy."

i.    Gloria Einstein similarly noted that the policy being considered leaves teachers with no room as a citizen with any beliefs, including in their private lives.

j.    Leo Boyer was a former student of McMath and spoke highly of the academic prowess of McMath and the harm of her being out of class.

k.      Daysha Perez is another student of Ms. McMath who also focused on what it is like to have McMath as a teacher. It's "never political" and always based in love and appreciation.

l.      Natalie Dryer said she spoke <u>"on behalf of Moms for Liberty."</u> She said parents thank them for <u>"exposing the District's secret gender transition plans."</u> She referred to McMath's speech as <u>"vile"</u> and claimed <u>Moms for Liberty could help solve the District's enrollment decline.</u>

m.      Monica Gould spoke as a teacher at Duval County Public Schools about the harm and persecution teachers face.

150.   As speakers went on, those who shared the Turning Point views received warmer receptions by the Board than those who expressed concerns. They were thanked and welcomed. Counterpoints were more rudely treated. It got to the point only those with pro Turning Point / Moms for Liberty or anti Hope McMath comments were routinely warmly thanked while others opposing those views were ignored as they left.

151.   Pro Turning Point / Moms for Liberty speakers were more commonly allowed to finish thoughts, but those opposing their views were abruptly cut off.

152.   At the October 7, 2025 school board meeting, each speaker was limited to one minute. Some met hostility, and even removal, if they exceeded 60 seconds. Each also was <u>required</u> to give their name and address.

153.   However, at the end of the meeting, <u>April Carney read one sole email she personally selected,</u> justifying the reading of the email falsely saying only "one voice" was often heard at meetings.

154.   This was unconstitutional preference and platforming of speech by a government official, which not only went on to attack McMath, but silence or not provide equal time to the other side of speech.

155.   Further, Carney was untruthful. Dozens of voices were heard, expressing plenty of views on both sides. Her stigma sought to chill speech through rhetoric and falsehood.

156.   Unlike every speaker who had to reveal their name and address, <u>April Carney kept the name (and address) of the sender secret. The secret e-mail was not introduced into the record.</u>

157.   April Carney further broke the rules the body instituted along with the First Amendment rights of each speaker when she boosted her own political views above others with an email she read from the unnamed person from 4:28.18 to 4:34.28- <u>over 6 minutes without interruption.</u>

158.   Even though the Board did not have McMath on any agenda, April Carney read the email with passion and emphasis, discussing how McMath was "excusing murder as karma," raised questions about McMath's mental health, insisted there were "red flags" prior to hiring McMath, claimed McMath handed out "blasphemous posters to District students," claimed McMath had "obvious lack of professional judgment," accused McMath of mocking children's religion, appealed to the superintendent that he must be "blown away" by McMath's actions, and otherwise excoriated McMath.

159.   Through April Carney, the anonymous person expressed it was the superintendent's and board's job to "steer" the school system "back to the middle" while noting it had gone "far left."

160.   Carney then blamed public commentary and debate in School Board meetings for "so much political violence" in schools. She said, "this parent" speaks for thousands, but claims they "only hear one side."

161.   Carney concluded her closing argument taking about people "celebrating murder." No one celebrated murder in this District. It's a false trope.

162.   Out of turn and procedure, someone in the crowd noted Charlie Kirk was biased against "black people" and Carney and Joyce screamed the person down.

Carney then screamed, "Charlie Kirk held the largest coalition of African Americans…" when she was physically patted by Joyce to stop screaming.



163.    Carney demonstrated direct selective enforcement and led a clear violation of the Board's own rules implemented to limit speakers and also stigmatized speech and accused speakers of causing "violence" in schools.

164.    Carney openly chose to promote speech she agreed with and provided no counter point, although noted there were email in support of McMath.

165.    Other educators and students are taking note and their speech is being chilled by such an openly biased -and even angry- display by school board leadership.

166.   DCPS School Board Chair Charlotte Joyce also took time at the end of the meeting to memorialize Charlie Kirk. She noted that as she was watching his memorial, she wanted "to do something to remember Kirk." She noted she could have just used the word, "Freedom," but specifically chose, "This is the Turning Point." Seconds later, she adjourned the meeting.

## MOMS FOR LIBERTY INVADES THE DUVAL COUNTY SCHOOL BOARD

167.   It is important to emphasize that the SOLE complainant identified by Duval County Public Schools is Moms For Liberty. Duval County Public Schools has not and will not provide the complaint.

168.   On September 29, 2025, Action News reporter Ben Becker posted on the social media platform x (formally known as Twitter):



169.   In the accompanying online article, Becker entitled it, "'Karma's a b****': DA teacher's Charlie Kirk post and others prompt Moms for Liberty complaint."

170.   Action News posted what was allegedly given to Becker by Moms for Liberty as the actual complaint against McMath.[28]

171.   The alleged complaint was posted to an archive site known as Scribd, but the link says it was removed from Scribd. It is still hosted on Action News website.

172.   The full alleged complaint from the media website is attached hereto as Exhibit "B."

173.   Despite asking the Department of Education, Duval County Public School administration and the School Board, no one will provide the complaint to McMath.

174.   DCPS has confirmed the sole complainant is Moms for Liberty.

175.   Plaintiff cannot reasonable discern who among the DCPS School Board are members of, officers to, pledged to, endorsed by, rewarded by or otherwise apart of the Moms for Liberty agenda to remove Hope McMath.

---

[28] https://www.actionnewsjax.com/news/local/karmas-b-da-teachers-charlie-kirk-post-others-prompt-moms-liberty-complaint/5AOL7VPVM5B6PNTFWIUTJ6J73I.

176.    Given recent antagonistic statements by multiple members of the school board alongside four members wearing Charlie Kirk themed shirts, the bias is readily apparent and the partisan censorship of speech is clear and unconstitutional.

## GOOSE VERSUS GANDER: INCONSISTENCY ABOUNDS AT DCPS

177.    Defendants seem focused on censuring speech which does not meet their leadership's or their donor's political agenda.

178.    Ms. [Name redacted] is an active teacher at Duval County Public Schools, who has received numerous complaints and a mere internal reassignment at her school. [Name redacted] has not received the same punishment for far right-sided speech, including within the classroom.

179.    [Name redacted] has not spent the last several months alone in a room awaiting a scintilla of due process.

180.    Instead, according to the Duval Schools website, Ms. [Name redacted] continues to teach science at [Name redacted]. Her public Instagram page notes she is a "DCPS Chemistry teacher."

181.    Ms. [Name redacted] has a publicly available presence on Core, the Duval court system's public records database. In 2016, Ms. [Name redacted] had a final judgment entered against her for protection against stalking. In the injunction, Ms. [Name redacted] was noted to make "obscene hand gestures" to someone's

surveillance cameras and use her great dane to harass a neighbor despite a final injunction.

182.    On her previously publicly available Instagram, Ms. [Name redacted] posted proudly about her religion, mocked people who wore masks to prevent COVID and posted support for Donald Trump, saying, "God has Blessed America."

183.    Based on her own situation, Plaintiff is confused about the vague standards of investigation and discipline under the First Amendment at DCPS.

184.    In one post, Ms. [Name redacted] posted a photo of a hat, which refers to Donald Trump and says, "Re-Elect that motherfucker."



185.    Ms. [Name redacted] also posted a xenophobic meme about an association between migrants and murder.



186.   Ms. [Name redacted] has also posted a parody of "gender neutral tampons," noting they are "non-binary."



187.    In another post, Ms. [Name redacted] makes a joke about the Snuggle Fabric Softner bear becoming a drug user.



188.    Many of the students at [Name redacted] are immigrants, minorities and/or simply trying to get an education.

189.    Making matters more concerning, students have indicated to school and/or district leadership that [Name redacted] has referenced political and religious views in the classroom, but she has not received equal treatment from Defendant DCPS, DOE or their agents.

190.    Plaintiff is left alone to spend hours per day and many days per week away from students for simply exercising her protected speech, while other

teachers can be left alone to start up Turning Point USA or Club America clubs to further share that viewpoint.

191.   For instance, [Name redacted] is identified as a "Gifted" teacher at [Name redacted] High School.

192.   On her LinkedIn profile, [Name redacted] holds herself out as a, "Gifted Lead Support at [Name redacted] High School/DCPS Endorsement Facilitator at Duval County Public Schools."

193.   [Name redacted] further notes, she is, "Experienced Lead Facilitator with a demonstrated history of working in the education management industry. Skilled in Lesson Planning, Research, Tutoring, Curriculum Development, and Teacher Training. Strong support professional with a Specialist degree and PhD program focused in Administration; Educational Research and Evaluation from University of Florida and UNF." [Name redacted] has been at DCPS for over 21 years.

194.   [Name redacted] was recently very vocal on social media as there was a dispute about whether a "Turning Point" chapter should be started at [Name redacted] High School.

195.   Publicly available posts on [Name redacted]'s social media quote far-right political groups and note rage against immigrants, "Black lives Matter," transgender people. In one post, [Name redacted] comments, "Time for Change!" to

48

a rage-bait article entitled, "Welfare Queen Brags About 'Raping The Government' Taunts Working Americans."

196.    [Name redacted] habitually attacks democrats and reposts articles and stories which she even admits are false.

197.    Alongside campaigning to be sponsor of a Turning point chapter, [Name redacted] notes, "The TRANS population are the ones who are riddled with hate. They are the ones who have lost their humanity."



198.    As noted above, [Name redacted] also accused the trans community of "fire bombings" and grooming children.

199.    [Name redacted] referenced "antifa" as "embracing anarchy" and attempting to "erase the rights of women."

200.    Saying any student or potential student of hers "lost their humanity," accusing entire groups of people of being murderers, and the actual instigation of turbulence at its schools has completely gone ignored by DCPS while simply saying something in a general context about Charlie Kirk literally gets an educator indefinitely excommunicated.

201.    Plaintiff can go through thousands of teachers and show equally offensive posts, reposts and private conversations. All equally must be protected or not protected at all- the U.S. Constitution and Bill or Rights are not malleable.

## CAGGIANO VERSUS DUVAL COUNTY PUBLIC SCHOOLS

202.    Defendants are well area of these issues and have been involved in adverse court rulings on more extreme First Amendment cases than this one.

203.    In 2022, Sandalwood High School math teacher, Thomas Caggiano, was suspended following what was referred to my media as, "problematic racist and anti-LGBTQ posts on Facebook."[29]

---

[29] https://www.jacksonville.com/story/news/education/2020/12/02/sandalwood-teacher-suspended-slew-transphobic-anti-lgbtq-facebook-posts-duval-county/3788872001/.

204.    In what can be characterized as the opposite basis of Hope McMath's persecution, Thomas Caggiano refused to use a transgender student's pronouns.

205.    Caggiano received inclusion training following the incident, but "continued to speak out against the transgender community and post memes about other marginalized groups."

206.    Caggiano was further accused of lying during the investigation and even accused media of hacking into his social media accounts as a defense.

207.    In his posts — which were often graphic or explicit — Caggiano shared memes disparaging marginalized groups, including photos showing a figure in a pink skirt with long blond hair standing in front of a urinal or making fun of transgender celebrities like Caitlyn Jenner. A post written by Caggiano himself (not shared from someone else) called transgender people seeking to use public restrooms that line up with their gender "insanity."

208.    In his defense, Caggiano said, "sharing my belief on my personal Facebook that there are only two genders that correspond with the biological sex is not 'phobia'" and said that memes are a way to make political statements with a "touch of humor," but "sometimes the humor is in the eye of the beholder."

209.    Former students of Caggiano spoke with DCPS and said they "dreaded" going to his class because of his in-class issues and felt "exhausted" daily because

of his <u>behavior in the classroom</u>. None of these comments have ever been made about Plaintiff.

210. <u>One parent told DCPS investigators</u>, "From Mr. Caggiano's postings on Facebook, it is clear that he is <u>racist and hateful toward LGBTQ</u> individuals and as that racism caused and continues to cause immeasurable harm to anyone who is not white (not only physically, but also psychologically)." None of these comments have ever been made about Plaintiff.

211. A prior version of the DCPS school board voted unanimously to deliver Caggiano a written reprimand and to suspend him for five-days unpaid in reaction to the report.

212. On appeal, Caggiano argued that his suspension and reprimand violated his free speech rights. The court agreed, writing, "Turning to the law, the contours of teacher free speech are governed by the principles of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny whose framework created a balance between the constitutional rights of a teacher who comments upon matters of public interest as a citizen and the government's interest in the efficient delivery of the public educational services it provides through its teachers, administrators, and staff."

213. And, "In Pickering, a teacher sent a letter that was critical of the school board's operations and budgetary decisions, which was published in the local

newspaper. Id. at 564. Pickering was fired and a hearing was held, resulting in the board concluding that sufficient evidence existed to support his termination. Id. at 566−67. The Illinois state courts concluded that Pickering's letter was "detrimental to the best interests of the schools" and rejected the claim that his dismissal infringed upon his First Amendment rights to speak on a matter of public concern."

214.    The U.S. Supreme Court noted, "(T)he "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

215.    The Caggiano Court wrote, "Because the two reposts involved a matter of public concern, the next question is whether they presented a risk to the School Board's interest in running an efficient workplace that is free of disruption. On this point, no evidence was presented that the two reposts had any meaningful impact on the School Board's operations or that they created any disruption." And, "The posts occurred outside of the school, on Caggiano's own time and computer, and amounted to little more than harmless political chitchat; they collectively amounted to the proverbial hill of beans."

216.    To the extent it hasn't been clear, there is no evidence which has ever been presented or is known to Plaintiff that her reposts had any meaningful impact on the School Board's operations or that they created any disruption whatsoever.

217.  Despite the different content, lies and a far more sensation fact pattern, the state appellate court overseeing this very jurisdiction and school district, "REVERSED with instructions to strike suspension and reprimand from employment records and to reinstate pay and related benefits from time of suspension."

## ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF

218.  Plaintiff's free speech has been chilled now, and in the future, as she has been deprived of her very livelihood as a consequence of her speech.

219.  The First Amendment forbids the Defendants from unreasonably regulating speech or discriminating against speech on the basis of viewpoint during Board meetings. This was clear by the actions of wearing Turning Point shirts, evoking Charlie Kirk as a martyr, restricting speech while disobeying those restrictions and accusing McMath of wrongdoing, incitement and crimes.

220.  In concert, Defendants are promoting one political agenda over another. Some or all Defendants, such as Carney, are even angrily accusing those speaking of being evil, causing violence in schools or otherwise stigmatizing some views while rewarding others with kindness, extra time and certainly not accusing them of crimes and wrongdoing.

221.  Unless the actions, policies, and practices of Defendant are enjoined by this Court, Plaintiff will suffer the continuing loss of her constitutional rights and

Jacksonville's public schools will continue to be places of fear, suppression and aggression.

222.    DCPS officials even asked Ms. McMath if she would remove her private speech off of her personal social media during an interview.

223.    Plaintiff is also being prosecuted, persecuted and restricted by government officials, most who are closely associated or dependent on the Complainant's stage, promotion and resources.

224.    Discovery is necessary to determine if the individual Defendants herein are even qualified to vote or hold the role due to their open bias towards the complainant and against McMath and others similarly situated. Plaintiff seeks this relief as well.

225.    Plaintiff has suffered irreparable injury and continues to suffer irreparable injury as a result of the Defendants' actions, policies, and practices.

226.    Plaintiff will continue to suffer the violation of her First Amendment rights unless and until she is restored to her employment and position at DCPS

227.    Plaintiff does not have a plain, adequate, or complete remedy to protect her constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

228.    Plaintiff does not have an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive

relief. In cases involving the loss of First Amendment rights, such as in this case, monetary damages are inadequate.

229.    The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendants, which interfere with the public's rights guaranteed under the First Amendment.

230.    In this instance, no one has alleged any specific harm other than the hurt feelings or political weaponization of speech by a 501(c)(4), which brags about using the courts to enforce their will, specifically in part, because they have successfully gained control of a majority of certain School Boards, like the Defendants herein.

231.    Defendants aren't quietly using this power. They are politicizing it from their seats as elected officials. This is the mob rule Lincoln warned about if rule of law isn't respected and reverent.

232.    A permanent injunction will preserve Plaintiff's civil rights and will minimize the need to award extensive compensatory damages.

233.    Defendants should not be simultaneously speaking in an official in support of one side of protected speech while serving as prosecutors and persecutors of the other side of the same protected speech.

234.    Defendants should not be wearing t-shirts in an official meeting in support of one side of protected speech while serving as prosecutors and persecutors of the other side of the same protected speech.

235.   Defendants should not be reading e-mail in an official in support of one side of protected speech while disallowing the other side of the same time and ability to present their own protected speech.

236.   Defendants should not be in any way voting or participating in McMath's case, as they have shown bias against McMath and towards complainant, Moms for Liberty, Turning Point and Charlie Kirk.

## DAMAGES AND ATTORNEY'S FEES

237.   Because of Defendants' actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated violations of her rights in the future.

238.   Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

239.   Plaintiff has retained John Phillips and Phillips, Hunt & Walker, LLC, as her attorneys to represent her in this action.

240.   Defendants are obligated to pay Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988.

241.   Section 1988 allows a prevailing party to recover "a reasonable attorney's fee as part of the costs," 42 U.S.C. § 1988(b). A plaintiff is a prevailing party when she is "awarded some relief on the merits" that "materially altered the

legal relationship between the parties." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1376 (11th Cir. 2022).

## COUNT I
## FIRST AMENDMENT VIOLATION – RETALIATION
### (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)

242.   Plaintiff realleges the facts set forth in Paragraphs 1 through 241 and incorporates those facts into this Count by reference.

243.   This is an action for damages, declaratory relief and injunctive relief brought by the Plaintiff against DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION And ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

244.   Specifically, these Defendants each acted under the color of law to deprive McMath of her First Amendment Rights guaranteed by the U.S. Constitution.

245.   McMath's social media posts are purely public and purely protected speech.

246.   It is well established that public employees, including teachers, do not lose their First Amendment rights merely because of their occupation. *See e.g.*, *Pickering v. Board of Education*, 391 U.S. 563 (1968). Speech outside the scope of ordinary job duties is protected under the First Amendment, especially when it relates to a matter of public concern.

247.   Further, these Defendants were well aware of the recent *Caggiano* ruling in this very District censuring this type of action.

248.   In posting the political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff spoke as a private citizen.

249.   Defendants took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

250.   Defendants' actions directly deprived Plaintiff of her First Amendment rights.

251.   Defendants adverse actions were in direct response to Plaintiff's protected political speech.

252.   Plaintiff's personal and political posts were the motivating factors in Defendants' decisions to take retaliatory action against Plaintiff.

253.   Defendants' response to Plaintiff's expression was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

254.   Defendants' actions have chilled Plaintiff's speech.

255.   The actions taken by each Defendant named herein, and the rules and policies on which such actions are purportedly based, directly violate McMath's First Amendment rights and chill the right to future expression. Such actions, rules, and polices, should be enjoined to prevent further irreparable injury and a further chilling effect on McMath and others.

256.   Defendants' actions were based on their own objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

257.   Defendants' decision to discipline, shame and potentially terminate Plaintiff's employment was motivated by each / their opposition to Plaintiff's viewpoint, which the Defendant has repeatedly labeled as offensive and contrary to its "values."

258.   Plaintiff is likely to succeed on the merits of her claims.

259.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.      That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT II**
**FIRST AMENDMENT VIOLATION - CONTENT**
**AND VIEWPOINT DISCRIMINATION**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE,**
**APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY**
**RICARDO, FLORIDA DEPARTMENT OF EDUCATION and**
**ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

260.    Plaintiff realleges the facts set forth in Paragraphs 1 through 241 and incorporates those facts into this Count by reference.

261.    This is an action for damages, declaratory relief and injunctive relief brought by the Plaintiff against the Defendants DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION And ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

262.    Plaintiff is uncertain as to her rights and remedies following the suspension, discipline, reassignment and potential termination of her employment in apparent violation of the First Amendment to the United States Constitution.

263.    In posting the political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff spoke as a private citizen.

264.    Defendants DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION And ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

265.    Defendant's actions directly deprived Plaintiff of her First Amendment rights.

266.    Plaintiff's interest in speaking as a private citizen on matters of public concern necessarily outweighs Defendants' interests in advancing their own content- or viewpoint-discrimination or preventing Plaintiff from doing so.

267.    Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs Defendants' interest in content and viewpoint discrimination or imposing a heckler's veto.

268.   Defendants shamed, insulted, accused, suspended, reassigned and instituted termination proceedings against Plaintiff's employment because of Defendants opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

269.   Defendants never asserted that Plaintiff's political speech would upset the orderly operations of the classroom, nor were such disruptions reasonably foreseeable given the limited publication of Plaintiff's private speech, the lack of knowledge by her co-workers or students, Plaintiff's position and job responsibilities, and the content of Plaintiff's speech.

270.   In fact, the sole known complainant is in no way affiliated with her classroom, but instead a political entity with a history of weaponizing litigation.

271.   Plaintiff's speech did not, in fact, disrupt her classroom operations or harm anyone.

272.   Public reaction to speech is never a content-neutral basis for regulation. See *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

273.   The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." *Iancu v.*

*Brunetti*, 139 S. Ct. 2294, 2299 (2019); see also *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

274.    Defendants' decisions to stigmatize, reassign, suspend and/or institute termination proceedings against Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

275.    Defendants' decisions to terminate Plaintiff's employment was motivated by their own opposition to Plaintiff's viewpoint.

276.    Plaintiff is likely to succeed on the merits of her claims.

277.    Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT III
## FLA. STAT. § 1003.4505 – PROTECTION OF SCHOOL SPEECH
### (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)

278.    Plaintiff realleges the facts set forth in Paragraphs 1 through 241 and incorporates those facts into this Count by reference.

279.    In 2010, the Florida legislature enacted the statute regarding "Protection of School Speech," which states:

> *District school boards, administrative personnel, and instructional personnel are prohibited from taking affirmative action, including, but not limited to, the entry into any agreement, that infringes or waives the rights or freedoms afforded to instructional personnel, school staff, or students by the First Amendment to the United States Constitution, in the absence of the express written consent of any individual whose constitutional rights would be impacted by such infringement or waiver.* Fla. Stat. § 1003.4505

280.    Plaintiff's freedom of speech was and continues to be infringed.

281.    Plaintiff further alleges that she was subject to affirmative action in that she was harassed, retaliated against and subjected to adverse action.

282.    Plaintiff seeks all remedies available at law and in equity under Fla. Stat. § 1003.4505.

283.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT IV**
**RIGHT OF FREE SPEECH,**
**U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE,**
**APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY**
**RICARDO, FLORIDA DEPARTMENT OF EDUCATION and**
**ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

284.   Plaintiff realledge and incorporate by reference paragraphs 1 through 241.

285.   The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly

sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

286.   The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or initiatives, even if that speech does so in ways that many people may find unpleasant. Allegations of hurt feelings, real or specious, do not justify censorship of public speech.

287.   First Amendment protections extend to social media and out of classroom political opinions by educators.

288.   In this very jurisdiction, DCPS has been warned on the supremacy of the First Amendment. See *Caggiano v. Duval County Public Schools,* discussed above.

289.    By implementing and enforcing polices which as directly violative of McMath's rights, Defendants, under color of law, deprive Plaintiff of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution.

290.   Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

291.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT V**
**<u>VAGUENESS, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983</u>**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

292.   Plaintiff realleges and incorporates by reference paragraphs 1 through 241.

293.   Because notice is the first element of due process, the Fourteenth Amendment's Due Process Clause prohibits the enforcement of vague laws. The First Amendment likewise forbids the enforcement of laws that are so vague as to chill protected speech.

294.  The prohibitions, polices and persecutions of McMath's speech deemed "abusive," or "obscene" are each unduly vague, serving only to authorize Defendants' arbitrary censorship of speech they dislike.

295.  Further, Defendants refuse to provide any explanation, complaint or due process whatsoever, even failing to respond to Public Record Requests. Attached hereto As Exhibit "C".

296.  By enforcing these provisions, Defendants, under color of law, deprive Plaintiff of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

297.  Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

B.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

C.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

D.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

E.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

F.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

G.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

H.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

I.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

J.   That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT X
## MALICIOUS PROSECUTION BY MOMS FOR LIBERTY AND/OR MOMS FOR LIBERTY DUVAL

298.   Plaintiff realleges and incorporates by reference paragraphs 1 through 241.

299.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted an investigation and resultant legal proceedings against Plaintiff.

300.   Defendants Moms for Liberty and/or Moms for Liberty Duval sent the complaint to the media in order to further bolster its complaint and weaponize it against Plaintiff.

301.   Defendants Moms for Liberty and/or Moms for Liberty Duval put pressure on the Defendants named herein to give priority to their complaint or otherwise require McMath defend herself.

302.   The actions of Defendants Moms for Liberty and/or Moms for Liberty Duval have caused McMath economic and non-economic harm, as well as the need to retain attorneys.

303.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was based in falsehood.

304.    Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was not supported by any first-hand evidence of in-class room misconduct.

305.    Defendants Moms for Liberty and/or Moms for Liberty Duval have a history of boasting about using lawsuits to shut down political opponents and those who do not agree with their views.

306.    Defendants Moms for Liberty and/or Moms for Liberty Duval have no reasonable ground or a lack of sufficient evidence to justify the actions they caused.

307.    Defendants Moms for Liberty and/or Moms for Liberty Duval acted with an improper or wrongful motive.

308.    The action was commenced by the Florida Board of Education and a second one was commenced by Duval County Public Schools.

309.    McMath suffered harm, such as financial loss, humiliation, or emotional distress, as a result of the prior proceedings.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

B.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

76

C.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

D.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

E.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT XI
## DEFAMATION BY MOMS FOR LIBERTY AND/OR MOMS FOR LIBERTY DUVAL

310.    Plaintiff realleges and incorporates by reference paragraphs 1 through 241.

311.    Defendants Moms for Liberty and/or Moms for Liberty Duval have falsely claimed McMath has improperly violated the law or school policies.

312.    Defendants Moms for Liberty and/or Moms for Liberty Duval provided the falsehoods to media, Ben Becker with Action News.

313.    Defendants Moms for Liberty and/or Moms for Liberty Duval sent the complaint to the media in order to further bolster its complaint and weaponize it against Plaintiff.

314.    This publication was premised in falsehood and designed through malice.

315.   The actions of Defendants Moms for Liberty and/or Moms for Liberty Duval have caused McMath economic and non-economic harm, as well as the need to retain attorneys.

316.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was based in falsehood, lies and defamation and did so for malice.

317.   Defendants Moms for Liberty and/or Moms for Liberty Duval have a history of boasting about using lawsuits to shut down political opponents and those who do not agree with their views.

318.   Defendants Moms for Liberty and/or Moms for Liberty Duval acted with an improper or wrongful motive, to maliciously harm McMath and suppress speech.

319.   McMath has suffered harm, such as financial loss, humiliation, or emotional distress, as a result of the defamation.

WHEREFORE, Plaintiff prays for the following relief:

A.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

B.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

C.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

D.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

E.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT XII**
**TORTIOUS INTERFERENCE BY MOMS FOR LIBERTY AND/OR MOMS FOR LIBERTY DUVAL**

320.   Plaintiff realleges and incorporates by reference paragraphs 1 through 241.

321.   Defendants Moms for Liberty and/or Moms for Liberty Duval have falsely claimed McMath has improperly violated the law or school policies.

322.   Defendants Moms for Liberty and/or Moms for Liberty Duval provided the falsehoods to media, Ben Becker with Action News.

323.   Defendants Moms for Liberty and/or Moms for Liberty Duval sent the complaint to the media in order to further bolster its complaint and weaponize it against Plaintiff and get her removed from her job as an educator.

324.   These actions were premised in falsehood and designed through malice.

325.   The defendant(s) acted *intentionally* to disrupt the relationship between McMath and her employer and/or used coercion or inducement to cause her contract and employment to be I jeopardy and possibly terminated.

326.   The defendant's actions were unjustified; and

327.   McMath was under contract with Duval County Public Schools, a fact known to Defendants.

328.   The actions of Defendants Moms for Liberty and/or Moms for Liberty Duval have caused McMath economic and non-economic harm, as well as the need to retain attorneys.

329.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was based in falsehood, lies and defamation and did so for malice.

330.   Defendants Moms for Liberty and/or Moms for Liberty Duval have a history of boasting about using lawsuits to shut down political opponents and those who do not agree with their views.

331.   Defendants Moms for Liberty and/or Moms for Liberty Duval acted with an improper or wrongful motive, to maliciously harm McMath and suppress speech.

332.   McMath has suffered harm, such as financial loss, humiliation, or emotional distress, as a result of the defamation.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

B.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

C.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

D.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

E.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## **JURY TRIAL DEMANDED**

WHEREFORE, Plaintiff, HOPE McMATH, demands a jury trial against Defendants, DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION, ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION, MOMS FOR LIBERTY INC, and MOMS FOR LIBERTY – DUVAL.

Law Office of Phillips, Hunt & Walker


 **/s/ John M. Phillips**
JOHN M. PHILLIPS, ESQUIRE

Florida Bar Number: 0477575

 **/s/ William K. Walker**
WILLIAM WALKER, ESQUIRE

Florida Bar Number: 0085552

660 Park Street

Jacksonville, FL 32204

(904) 444-4444

(904)508-0683 (facsimile)

Attorneys for Plaintiff

jmp@floridajustice.com

william@floridajustice.com

anne@floridajustice.com