## UNITED STATES DISTRICT COURT
## OF THE MIDDLE DISTRICT OF FLORIDA

### Case No.: 3:25-cv-01498

HOPE MCMATH,

     Plaintiff,

v.

DUVAL COUNTY PUBLIC SCHOOLS,
CHARLOTTE JOYCE, APRIL CARNEY, MELODY
BOLDUC, ANTHONY RICARDO,
FLORIDA DEPARTMENT OF EDUCATION
and ANASTASIOS KAMOUTSAS, AS COMMISIONER
OF EDUCATION, MOMS FOR LIBERTY, INC. and
MOMS FOR LIBERTY - DUVAL,

     Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES, EQUITABLE RELIEF AND DEMAND FOR JURY TRIAL

     COMES NOW the Plaintiff, HOPE MCMATH, by and through her undersigned counsel, and files this Complaint for Damages and Equitable Relief against DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, the FLORIDA DEPARTMENT OF EDUCATION and its COMMISSIONER, ANASTASIOS KAMOUTSAS, as well as MOMS FOR LIBERTY, INC. and MOMS FOR LIBERTY - DUVAL (all collectively referred to herein at "Defendants"), and alleges as follows:

1

## JURISDICTION AND VENUE

1.    *U.S. Const. Amend. I,* as incorporated through the *U.S. Const. Amend. XIV*, prohibits state government from making any law abridging the freedom of speech.

2.    First Amendment protections extend to public school teachers (and students), "neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022).

3.    Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, seeking damages, declaratory and injunctive relief against the government Defendants for their violation of Plaintiff's First and Fourteenth Amendment rights.

4.    42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

5.    42 U.S.C. § 1983 permits the recovery of damages—that is, monetary relief—against a state or local official whose conduct results in a deprivation of rights "secured by the Constitution."

2

6.     This Complaint seeks damages and relief against Duval County Public Schools and the Department of Education, as well as members of the school board of Duval County Public Schools and Commissioner of the Department of Education, as these Defendants violated clearly established Federal and Constitutional rights of which a reasonable person would have known. As such, this honorable Court is proper.

7.     This Complaint further seeks damages which are inextricably intertwined with the actions of Moms for Liberty and Moms For Liberty – Duval, as complainant. While not state entities, they are in some way managed, comingled with or have significant influence between the other Defendants herein.

8.     This action further seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain rules, policies and practices of Defendant DCPS and its leadership (including but not limited to school board members wearing partisan clothing on the dais while doing DCPS business, elevating one side of political speech over another, allowing extra time to a preferred viewpoint, allowing extra protection or rule breaking based on viewpoint, calling speakers evil and violent while calling others martyrs, brave and more).

9.     This action further seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties

involving the constitutionality of certain rules, policies and practices of Defendant DCPS, DOE and their leadership.

10. There are additional substantial *bona fide* doubts, disputes, and questions which must be resolved concerning Defendants' actions taken under color and authority of state law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

11. This Complaint seeks damages, declaratory and injunctive relief to prevent further violations of the Plaintiff's rights, privileges, and immunities under the Constitution of the United States and 42 U.S.C. §1983 and §1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States.

12. The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. § 2201 and §2202, and Rule 65 of the Federal Rules of Civil Procedure.

13. The Court may enter an award of attorney's fees pursuant to 42 U.S.C. § 1988.

14. Venue is proper in the Northern District of Florida, Jacksonville Division, since all parties are situated in Jacksonville, and all the actions complained

of occurred within the district and geographical area assigned to the Jacksonville Division.

## **THE PARTIES**

15.    Plaintiff is Hope McMath, a resident of and educator in Duval County, Florida.

16.    At all material times prior to her exercise of protected speech, the Plaintiff was employed by Douglas Anderson School of the Arts, a Duval County Public School, in Jacksonville, Florida, where she has taught AP Art History students since 2024.

17.    Defendant Duval County Public Schools ("DCPS") is a school district that operates the public schools of Duval County, Florida. DCPS is managed by an elected seven-member board.

18.    Defendant Charlotte Joyce (hereinafter "Joyce" or "Ms. Joyce") is the Chair of the Duval County School Board.

a.    Ms. Joyce signed a pledge to Moms for Liberty on November 3, 2022.[1]

b.    Ms. Joyce was endorsed by Moms for Liberty.

c.    Ms. Joyce wore a Turning Point t-shirt on the dais doing official School Board Business.[2]

---

[1] https://portal.momsforliberty.org/files/3031/
[2] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

d.     Ms. Joyce has openly advocated for both Moms for Liberty and Turning Point's agenda from DCPS's dais and across her professional and personal life.

e.     Ms. Joyce has specifically censured and referenced Ms. McMath's speech and alleged misconduct during school board meetings, as well as on her personal time.

19.     Defendant April Carney (hereinafter "Carney" or "Ms. Carney") is the Vice Chair of the Duval County School Board.

a.     Ms. Carney signed a pledge to Moms for Liberty on October 4, 2022.[3]

b.     Ms. Carney is on record as being a "member" of Moms for Liberty.[4]

c.     Carney touted the endorsement of Moms for Liberty on her website.[5]

d.     Carney wore a Turning Point t-shirt on the dais doing official School Board Business.[6]

e.     Ms. Carney has openly advocated for both Moms for Liberty and Turning Point's agenda from DCPS's dais and across her professional and personal life.

---

[3] https://portal.momsforliberty.org/files/2977/
[4] https://floridapolitics.com/archives/666984-jacksonville-bolf-for-3-27-24-april-carneys-confessional/
[5] https://web.archive.org/web/20230605195026/https://aprilcarney.com/
[6] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

f.    Ms. Carney has specifically censured and referenced Ms. McMath's speech and alleged misconduct during school board meetings, as well as on her personal time.

20.    Defendant Melody Bolduc (hereinafter "Bolduc" or "Ms. Bolduc") is a member of the Duval County School Board.

a.    Bolduc's official campaign website listed her as a "member" of Moms for Liberty.[7]

b.    Moms for Liberty notes Bolduc was endorsed by it.[8]

c.    Bolduc wore a Turning Point t-shirt on DCPS's dais doing official School Board Business.[9]

21.    Defendant Anthony Ricardo is a member of Duval County School Board. He is sued in her official and individual capacities.

a.    Moms for Liberty notes Ricardo was endorsed by it.[10]

b.    Ricardo wore a Turning Point t-shirt on DCPS's dais while doing official School Board Business.[11]

---

[7] https://web.archive.org/web/20240322085936/https://www.melodybolduc.com/
[8] https://portal.momsforliberty.org/news/duval-school-board-2-moms-for-libertyendorsed-candidates-win/
[9] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi
[10] https://portal.momsforliberty.org/news/duval-school-board-2-moms-for-libertyendorsed-candidates-win/
[11] https://www.jacksonville.com/story/opinion/columns/guest/2025/10/23/turning-point-shirts-on-dcps-board-members-may-be-a-warning-sign-opinion/86817250007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116401p002150c002150e000400v116401b0043xxd004365&gca-ft=234&gca-ds=sophi

22.    Defendant the Florida Department of Education ("FDOE") is a department within Florida government, led by a seven-member board which oversees all of Florida's public-school districts.

23.    Defendant Anastasios Kamoutsas is the appointed Commissioner of the Florida Department of Education. He has instituted disciplinary proceedings and been very vocal against McMath and others, as well as spoken from Moms for Liberty's stage noting he is part of the war against a liberal, woke agenda and also noting he will do everything within his power to protect Turning Point USA in schools.

24.    Moms for Liberty, Inc, a 501(c)(4) is a Florida organization, whose self-described mission, "is to organize, educate and empower parents to defend their parental rights at all levels of government." It operates in Jacksonville, Duval County, Florida. They are made up of members, advocates and decisionmakers, which are otherwise government employees named herein.

25.    Moms for Liberty – Duval County, is an affiliate or chapter of the 501(c)(4) organization. It operates in Jacksonville, Duval County, Florida.

## HOPE MCMATH

26.    The Plaintiff is an educator at Douglas Anderson School of the Arts, a Duval County Public School, in Jacksonville, Florida.

27.     Ms. McMath holds a Bachelor's Degree in visual art and art history and a Master of Arts in Teaching from Jacksonville University.

28.     Prior to being hired by DCPS at Douglas Anderson School of the Arts, McMath served at the Cummer Museum of Art & Gardens for 22 years. She was the executive director at "the Cummer" for 8 years.

29.     From her early years as a museum educator through her tenure as director, McMath implemented art programs, education outreach, and facility expansions that increased the Cummer's relevance and reputation.

30.     At all times, McMath used social media to exercise her political opinions, promote art and encourage kindness and unity.

31.     At all times, McMath worked, and works, as a printmaker with a passion for combining images, words and social comment as a method of putting her speech, views and opinions into visual display, as well as celebrate peace and unity.

32.     At all times, McMath has held herself out publicly as, one who "creates works of art as a means to process the world around her and engage others in conversations around human rights, anti-racism, the importance of women's voices, environmental justice, and civic engagement."

33.     These views, expressions and manifestations existed prior to and during her employment by DCPS. In fact, it was part of why she was retained to lead a class

of very advanced students interested in art history at a very advanced school which uniquely marketed to students, "with a desire for intensive study in the arts."[12]

34.    McMath was unfairly targeted as part of a larger campaign which targeted similarly situated teachers across the county over protected speech found disagreeable to this political non-profit and government leaders, which drastically increased immediately following the murder of Turning Point USA's founder, Charlie Kirk.

35.    McMath has been certified by the Department of Education to teach since July 1, 2022.

36.    Ms. McMath posted protected political speech on her time on her personal social media (Facebook and/or Instagram), which subjected her to persecution by Defendants.

37.    Ms. McMath's protected political statements were not said, posted or presented during the school day or in the classroom.

38.    Ms. McMath's protected political statements were in no way affiliated with her job as a part-time educator.

39.    Defendants did an investigation and confirmed McMath's speech in no way invaded or was brought in the classroom, but still persecuted her. The investigation revealed clear evidence supporting Ms. McMath:

---

[12] https://www.duvalschools.org/o/dahs/page/about-douglas-anderson-school-of-the-arts

10

a.    One parent of a student told her principal, "Ms. McMath is an excellent teacher who creates a safe, measured and balanced classroom environment for her students. I have no doubt that, with Ms. McMath's instruction, my child will be successful on the AP Exam." And, "I am appalled that she has been temporally reassigned. Ms. McMath has been professional in the classroom, creating a learning environment that fosters engagement with the subject." And, "She is a highly effective classroom teacher who builds community at Douglas Anderson by creating a safe space for students to engage in thoughtful discussion, no matter their political background." And, "Hope McMath, however, is no threat to students. On the contrary, she is an inspiring leader who is teaching my child about the historical significance of art in culture."

b.    Another parent of one of McMath's students wrote, "She absolutely loves this class and adores her teacher (McMath)."

c.    Another parent of a student wrote, "Ms. McMath has been a truly excellent teacher during the time my daughter has been in her class. She has served as an artistic mentor and helped foster creativity, an understanding of art and history, and been an encouraging force for her students. She is an active participant in our local art community and is a role model for her students for volunteerism." And, "(I)f it is the case that she is being removed from the classroom for her beliefs, myself and many other parents and students find this deeply troubling."

11

d.      Another parent said to DCPS, "As someone who has followed her career since her time at the Cummer Museum, I can tell you she is an exemplary culture worker, advocate, and educator. When my student told me in their sophomore year that Mrs. McMath was one of their teachers, I was thrilled. My student and their friends all adore Mrs. McMath, and often speak about her class as "life-changing" and having a positive effect on how they practice and view art." And, "I don't have to tell you that that kind of impact is the stuff teachers dream of." And, "I feel very strongly that Douglas Anderson is a better place with teachers like Hope McMath. She is a valuable asset and I sincerely hope you will treat her as such for the sake of all your students."

e.      Fellow teacher, Khanh Tran, wrote to the Department of Education's inquiry, "Hope has always been extremely respectful towards me, helpful to our sculptural needs, and the epitome of Professionalism. We are very fortunate to have her as Gallery Director and the AP Art History teacher. The student's artworks are professionally exhibited, and the schools College Board Exam scores increased dramatically since the previous instructor and even matched the national average percentile."

f.      In the FDOE file, a student notes, "Mrs. McMath has always conducted herself with the utmost kindness, respect, and professionalism both on and off campus. She makes her students feel safe, comfortable, and welcome. Her

contributions to the school and the community go beyond being an amazing AP art history teacher."

g.    Another student told FDOE, "This email is in response to the recent removal of my teacher Hope McMath, and how distraught this removal has made me. This email is about my experience with Ms. McMath as my teacher last year. She has been the most professional, passionate, and knowledgeable teacher I have ever had and only spoke about the art history she was teaching in the classroom. I have never once been uncomfortable with anything she has said and I have never heard her say anything that would provoke discomfort in the classroom. Ms. McMath has inspired me to try my best in all aspects of my life including art and academics, she is constantly pushing us to do our best in class and she makes sure she gives as the tools and knowledge to succeed. In all of my years at DA I have never felt more seen or received as much help as I did from Ms. McMath."

40.    Ms. McMath has never promoted her social media to students. In fact, McMath routinely told / tells her students they were / are not allowed to engage with her on social media. All of the complaints and emails opposing Ms. McMath came from anonymous e-mail accounts or people who had no first-hand experience with her in the classroom.

41.    In addition to not using social media in the classroom, McMath routinely blocks any identified students (and their identifiable parents) who like, comment, follow or friend her personal social media pages.

42.    Ms. McMath was one of many educators across Florida who were persecuted solely for the content of their speech. Ms. McMath has been on administrative leave and unable to teach her AP Art History students due to the actions of both DCPS and FDOE.

43.    There is no allegation or evidence Ms. McMath was removed from her classes or disciplined for anything which happened in the classroom, on school property or using school resources.

44.    There is no allegation or evidence Ms. McMath was removed as a result of speaking in her capacity as a government employee.

45.    Ms. McMath was speaking about a matter of public—rather than private—concern.

46.    Ms. McMath's interest in talking about her protected political beliefs and speech on her own time outweighs the state's interests in promoting the efficient delivery of public services, which were otherwise not interfered with in any way.

47.    At a nearly two-hour meeting with Duval County Public School officials, it was revealed that there were no complaints, investigations or reports by

any student, parent, fellow teacher or administrator in any way associated with Ms. McMath.

48.    Stated alternatively, there is no known student of Ms. McMath who claims, or has claimed, they accessed, were subjected to or influenced by McMath's political viewpoints or political opinions.

49.    There is no improper conduct, victimization, crime or claim against McMath in any classroom or schoolhouse whatsoever.

50.    Ms. McMath has been removed from her classroom and school for months as a result of a political group (and its allies) at war with its perceived political "liberal" opponents.

51.    Ms. McMath has been removed from her classroom and school for months due to an alleged violation of a social media policy at DCPS, which is facially overbroad and unconstitutional.

52.    Instead of allowing McMath to teach while anonymous and uninformed complaints were investigated, McMath was relegated to a distant warehouse known as "Bull's Bay," which can only be described as purgatory for teachers. They have limited access to other humans, are given mundane tasks and/or simply sleep all day. It was horrible on McMath's mental health.

53.    Ms. McMath was reassigned to assist with framing student art and other tasks, but can get no timeline or answers from the Defendants.

54.     Until after filing this lawsuit, Duval County Public Schools and the Florida Department of Education refused to respond to requests for any and all complaints or supporting information which led to her investigation.

55.     Ms. McMath faces revocation of her ability to educate as a spoil of Defendants desire to persecute speech they disagree with.

## CHARLIE KIRK

56.     This lawsuit stems from the aftermath of the tragic shooting of Charles James "Charlie" Kirk (hereinafter, "Mr. Kirk" or "Kirk").

57.     Mr. Kirk was born on October 14, 1993. Until his death on September 10, 2025, Kirk was known as a political activist, entrepreneur, and media personality.

58.     Kirk co-founded the conservative student organization Turning Point USA (hereinafter, "TPUSA") in 2012 and published a range of very right-leaning books and hosted the podcast *The Charlie Kirk Show*.

59.     Kirk also hosted a question-and-answer tour across America where moderators would choose people out of the audience to debate Kirk, often leading to viral moments posted to the internet.

60.     Based largely on campus tour clips and podcast excerpts, Kirk rose to prominence, particularly in the Republican Party. Mr. Kirk was unquestionably a

political figure, celebrity and sought out and platformed divisive stances which led to tremendous fame.

61.    Kirk's publications platformed sensational and divisive statements, which put many Americans at odds with each other. Many Americans were cast off as evil or seeking war, while others are told they must fight for their lives and religious salvation at any and all cost.

62.    Kirk even addressed the correlation of violence and political speech, saying, "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational." This was said at an event organized by TPUSA Faith, the religious arm of Kirk's conservative group Turning Point USA, on April 5, 2023.

63.    After Kirk's death, some praised him. Others posted clips and took more disagreeable stances.

## CHARLIE KIRK: A MATTER OF PUBLIC CONCERN

64.    McMath admittedly posted on her personal social media, "Karma's a bitch – and she heard all your speeches when you proudly proclaimed that you didn't give a shit about other people's lives."

65.     In a letter from the Department of Education, specifically written by its Commissioner, Anastasios Kamoutsas, Kamoutsas calls this statement, "grossly immoral."

66.     Kamoutsas notes Kirk was a "public figure" and this was in the "wake" of his death, occurring proximately subsequent thereto.

67.     After his assassination, many Americans were outraged that Kirk was receiving praise without mention of his controversial, if not discriminatory, statements.

68.     Some, like Defendants herein, wanted to censure all criticism of Charlie Kirk.

69.     Others felt a personal obligation to keep Kirk's statements in a context they felt was being manipulated or improperly martyred. This is all protected speech. The pendulum of the First Amendment protects both sides.

70.     Much of the criticism and contextualization mentioned Kirk's divisive views on race.

a.     About African Americans, Kirk used statements like, "(P)rowling Blacks go around for fun to go target white people, that's a fact. It's happening more often."

b.    On *The Charlie Kirk Show,* on May 19, 2023, Kirk used racially triggering and inciteful words like, "thugs," and said repeatedly he wanted to see an end to, "a pattern of blacks prowling the streets… (who) feel untouchable."

c.    Kirk noted he was concerned about what he called, "social justice warrior simulation theory," which was conditioning Americans to, "take the black person's side over the white person."

d.    On the  May 19, 2023 edition of *The Charlie Kirk Show*, Kirk said, "more than 600 white women a year are murdered by black men." These stats have been highly criticized by media.[13]

e.    Kirk said, "MLK was awful. He's not a good person."

f.    And, "If I see a Black pilot, I'm going to be like, boy, I hope he's qualified."

g.    And, "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"

h.    And, "lacks were better off under slavery."[14]

71.    Kirk also spoke against, "the decline of American men" and blamed it on the LGBTQ movement, including noting, America should "just take care of"

---

[13] See https://www.reuters.com/article/world/fact-check-false-data-on-us-racial-murder-rates-idUSKCN24I29S.
[14] See https://www.instagram.com/reel/DOcqXWzDMHn/?hl=en.

transgender people, "the way we used to take care of things in the 1950s and 60s," which some noted subjected transgender people to abuse, beatings, forced psychological intervention and severe persecution.

72.     Kirk also commonly attacked women who were not espousing his values or not being as submissive as his teachings required. For instance:

a.     Kirk addressed popular singer Taylor Swift and her NFL husband Travis Kelce on his radio show telling them, "Reject feminism. Submit to your husband, Taylor. You're not in charge."

b.     Kirk discussed the use of the term, "Karen," which he called a, "slur," noting, "liberal women are awful, they're trying to get us to accept disgusting behavior by exploiting our distaste for a subtype of white liberal woman. And they also just want to start a race war. The left would love to see a race war."[15] (Emphasis added).

73.     The rhetoric that "liberal women" are awful, destroying moral fiber, anarchists or trying to start a literal war is arguably outside the lines of protected speech, but was consistently used by Turning Point and Kirk supporters, as well as Moms for Liberty and its supporters to justify white liberal women as evil, harmful to children and to be blamed for violence and a key weapon to make their cries for

---

[15] May 19, 2023 The Charlie Kirk Show. See https://www.mediamatters.org/charlie-kirk/charlie-kirk-goes-unhinged-racist-rant-prowling-blacks-go-around-fun-go-target-white.

division and weaponization justified due to a life or death need to defend Christian values. It became and continues to be increasingly dangerous.

74.    Kirk juxtaposed his views and beliefs in Christianity with the need to hold those who believed or looked different as "less than," evil or enemies.

a.    About people of non-Christian faith, Kirk said, "Islam is not compatible with Western civilization."

b.    And, "Islam is the sword the left is using to <u>slit the throat</u> of America." This again invokes speech so ethereal, it's makes anyone associated to it subject to attack by the followers of those who utter it.

c.    And, "The American Democrat party hates this country. They wanna see it collapse. They love it when America becomes less white."

d.    Kirk continuously called those who took stances in disagreement with him, "social media jihadis," an expression used in Islamic and Muslim traditions, which has come to be Americanized as an expression of war.

75.    Over and over, Kirk said people like Plaintiff, or other fellow suspended teachers, wanted to start a war. Those who wanted to stand up for themselves or give proper context then immediately took to social media, rejecting the view that Kirk was a universal national hero or in any way spoke for everyone.

76.    Social media algorithms fed this poison to the masses on each side to generate profits over people.

77.    Major news websites featured many of Kirk's soundbites on guns, race and more, as well has Kirk saying he wants to be remembered for the courage he had in his faith.[16]

78.    It is unquestionable that this was a matter of great public concern and debate, which is why McMath weighed in.

79.    Dissent to Charlie Kirk, his teachings, his views and his opinions were never brought into the classroom or schoolhouse by McMath in any way.

80.    Private and public officials universally started shaming, doxxing and then seeking to end the jobs, if not lives, of dissenting voices, including McMath.

81.    Meanwhile, Charlie Kirk always encouraged speech of all types and vociferously maintained speech should not be censured or persecuted by the government. On May 2, 2024, Kirk posted to the social media platform, "X" (formally known as Twitter), as follows, "Hate speech does not exist legally in America. There's ugly speech. There's gross speech. There's evil speech. And ALL of it is protected by the First Amendment. Keep America Free."



---

[16] https://www.instagram.com/reel/DOeymDdFXQ7/.

## THE "COMPLAINTS"

82.    At its initial investigative meeting, Duval County Public Schools informed McMath Moms for Liberty (and/or its affiliate Moms for Liberty- Duval) was (/ were) the complainant(s) in her case.

83.    When it produced its investigative file, DCPS revealed the initial complaint was generated by a September 12, 2025, email from momsforlibertyduval@gmail.com. It was signed, "Moms for Liberty Duval."

84.    The DCPS Complaint urged, "We request that you tour her classroom immediately and also review student notebooks to determine what is being taught in a supplemental way that goes well outside the lines of state curriculum (or AP standards). We believe you have cause to suspend McMath while the investigation is underway. McMath does not deserve a student audience for ONE MORE DAY. Our suspension and investigation request is why we have copied the Commissioner and board leaders."

85.    Despite clear notation to the contrary, this complaint does not appear in the Department of Education's file.

86.    The DCPS also contains screengrabs from social media which clearly were screen captured, saved and distributed by school board member April Carney.



87.    Defendant and school board member April Carney's profile photo appears in the bottom right corner of one or more exhibits in the DCPS file.



88.    Ms. Carney is not listed as a complainant and her name is not in the file.

24

89.    When the state produced its investigative file, the FDOE revealed the initial complaint was from an anonymous email, AmericanPatriot2022@protonmail.com and signed, "A concerned and disgusted parent."

90.    Requests to determine if this email was associated to April Carney were responded to "unknown" replies from FDOE representatives.

91.    The complaint to the FDOE noted, "These types of posts are a big part of the problem that our society is facing and an educator of the future leaders of tomorrow should absolutely know better and exemplify better judgement. I hope that you investigate this teacher, find her hateful speech as disgusting as I do and remove her from the classroom immediately."

92.    The email further threatened, "I debated on posting this on social media so that other parents can see what one of our children's educators, whom is trusted to set an example for kids, is posting on Facebook, but I decided not to take that route and give you the opportunity to address this issue."

93.    Both complaints contain similar accusations about similar posts.

## MOMS FOR LIBERTY, INC.

94.    Moms For Liberty, Inc. is a 501(c)(4) political operation who has expressed political disagreement with Ms. McMath in the past.

95.    Moms for Liberty- Duval is a chapter or affiliate of Moms For Liberty, Inc. It operated both in tandem and individually.

96.    While operating with its own email, social media pages and identity, the Moms for Liberty- Duval is recognized on the Moms for Liberty website. See https://portal.momsforliberty.org/chapters/duval-county-fl.

97.    The corporate structure of Moms for Liberty- Duval is unknown, but it appears to be operating an unincorporated association. Chapters like it have been granted authority to use this very federal courts to seek First Amendment relief and the chapters its primary incorporated organization are frequently interchanged / associated in pleadings.

98.    For instance, on July 26, 2022, Moms for Liberty – Brevard County, FL, filed a lawsuit in this court's Orlando division entitled, "Amended Complaint for Declaratory, Injunctive and Other Relief" in case number 6:21-cv-01849 in the United States District Court for the Middle District of Florida (Orlando Division). See Amended Complaint (Document 78).

99.    In that lawsuit, Plaintiff Moms for Liberty - Brevard County, FL ("M4L") self-identifies as, "The Brevard County Chapter of Moms for Liberty, a 501(c)(4) organization whose mission is to organize, educate and empower parents to defend their parental rights at all levels of government." See paragraph 3, Amended Complaint (Document 78).

26

100.   Throughout its website, Moms for Liberty, Inc. takes credit for the actions of its chapters, including this lawsuit, using terms like, "we."

101.   For instance, Moms for Liberty, Inc., published, "Moms for Liberty awarded over half a million in free speech battle against Florida school board." See https://portal.momsforliberty.org/news/moms-for-liberty-awarded-over-half-a-million-in-free-speech-battle-against-florida-school-board. Despite being filed in the name of, "Moms for Liberty - Brevard County, FL," the article notes, "Moms for Liberty has officially settled" the lawsuit.

102.   Moms for Liberty, Inc., was founded in 2020 by conservative women in Florida and has quickly expanded its presence across the country.

103.   Chapters of Moms for Liberty developed shortly thereafter. Some were registered with the State of Florida before being dissolved.

104.   Moms for Liberty landed national media attention for its efforts — sometimes successful — to fight COVID safety measures in schools, ban books, limit discussion about race and LGBTQ identities and populate local school boards with conservatives.

105.   Another example of the battle Moms for Liberty fought in courts was filed against the Tennessee Department of Education by a different chapter, alleging that a second-grade lesson on "Civil Rights Heroes" violated Tennessee's K-12 Divisive Concepts Act. Moms for Liberty alleged that white children were made to

feel discomfort upon seeing what history looked like. It further claimed that some children who experienced these lessons, "are seeing counselors to overcome the emotional trauma inflicted upon them by what they learned in Tennessee public education." Once such book was Frances E. Ruffin's book entitled, *Martin Luther King, Jr. and the March on Washington* (2001). It was filed in the name of Moms for Liberty – Wilson County, Tennessee.

106.   When the enforcement of the laws did not go far or quickly enough, chapters of Moms for Liberty's New Hampshire chapter recruited people to make reports and said that it would pay $500 to the first person to successfully catch a teacher breaking the state's new anti-divisive-subject law.[17]

107.   It is unknown what, if any, bounties, quid pro quo, endorsements, donations or allowance of public officials to be promoted on its stage or social media is tied to those government officials promoting their agenda or prosecuting their complaints.

108.   Moms for Liberty has indicated they are not going to stop their advocacy until their views are entirely integrated on all American children.

109.   Many of those children will suffer great harm, especially those who are not while, Christian, and/or gender-conforming children. Moms for Liberty itself justifies their efforts and calls it a war on values.

---

[17] https://www.businessinsider.com/anti-crt-moms-for-liberty-teachers-breaking-new-discrimination-law-2021-11

110.    Moms For Liberty, Inc.'s viewpoints are directly adjacent to Mr. Kirk's and Turning Point's stances on Christianity, LGBTQ, vaccinations, book censorship and other politically divisive issues.

111.    Recently, turningpointsmemo.com posted a story, "At Moms for Liberty Summit, Parents are Urged to Turn their Grievances Into Lawsuits."[18]

112.    The favorably written article, promoted Moms for Liberty's national summit in Orlando, Florida there was a new mission statement, indicating, "Where past Moms for Liberty attendees were urged to run for school board, this year they were encouraged to turn their grievances into legal challenges."

113.    In many ways, Turning Point and Moms For Liberty share platforms, agenda and aggressive intent to restore and reshape schools, and American society based on their shared beliefs.

114.    Upon the death of Kirk, Moms For Liberty's co-founder noted, "The work we are called to do at Moms for Liberty is the same work that Charlie Kirk and our friends at Turning Point USA have poured their lives into for more than a decade. We have always been united in this purpose and mission: to preserve America for future generations."[19]

---

[18] https://talkingpointsmemo.com/news/at-moms-for-liberty-summit-parents-are-urged-to-turn-their-grievances-into-lawsuits
[19] https://portal.momsforliberty.org/news/our-friend-charlie-kirk/

115.    Moms For Liberty further noted, "Evil showed up to battle yesterday. But evil **WILL NOT WIN** this war. **Put on your armor, moms!** Stand with courage and love. Fasten your belt of truth and the breastplate of righteousness. These are the tools we will use to overcome it." (emphasis in original). Id.

116.    Moms For Liberty consistently uses / used terms of war and division to case their believers as righteous and the other side as evil.

117.    Moms for Liberty's CEO and founder, Tina Desocvich, noted Moms for Liberty and its members needed to, "shake off the shackles of fear and stand for truth or we are going to lose Western civilization as a whole."

118.    Moms for Liberty's published goal is to, "infuse their values into schools."

119.    Florida's Attorney General, James Uthmeier, appeared at the convention and spoke from the state's perspective, "If you're identifying one of these wrongs that's violating your rights and then subjecting <u>our</u> kids to danger and evil, then we want to know about it," he said. "And we're going to bring the heat in court to shut it down."

## **ANASTASIOS KAMOUTSAS**

120.    Anastasios Kamoutsas leads the Department of Education. He wrote the letter seeking sanctions and initiating legal proceedings against McMath.

121.    Kamoutsas has been a lawyer in this state since 2014.

122.    Moms for Liberty's influence extends directly to Department of Education Commissioner Anastasios Kamoutsas. He recently spoke to their membership, which was promoted across social media in advance and the appearance was later archived by the group.

123.    A search of TikTok clips of Kamoutsas' excerpts reveal an obvious pro Charlie Kirk agenda. In one clip easily verified to be real, Kamoutsas says in front of his former boss, Governor Ron Desantis, "<u>Let me be very clear… If you haven't received the message already," if you in any way get in the way of a teacher or student trying to start a Turning point chapter, you will be met with the full force of the law</u>."[20]

124.    The Teacher Freedom Summit was held by the Teacher's Freedom Alliance shortly after Kamoutsas took the job. The CEO described it, as follows: "At the Teacher Freedom Alliance, we're giving educators real freedom, freedom from the liberal, woke agenda that has corrupted public education," And, "We will arm teachers with the tools, support, and freedom they need, without forcing them to give up their values. This is a battle for the future of our kids, and we will not lose."[21]

---

[20]

https://www.tiktok.com/@yourrepublicanmom/video/7566016235708714270?q=Kamoutsas&t=1761782989436
[21] https://www.facebook.com/watch/?v=881908554407894

125.    Kamoutsas spoke how aligned he was with the Teacher Freedom Summit's mission. He said they all needed to "fight back" against adverse political voices, expressed his alignment with Christian values and anti-Democrat stances.

126.    At Moms for Liberty's own seminar, Kamoutsas was on the panel with Kate Anderson from Alliance Defending Freedom and Sarah Parshall Perry from Defending Education. He thanked prominent members of Moms for Liberty, who he has worked with on issues pushing their agenda.

127.    During Kamoutsas' speech, he namedropped Tiffany Justice, the Co-Founder of Moms for Liberty, while also showing preference on their position on many controversial, political issues Moms for Liberty prioritizes.

128.    At the question-and-answer session of the Teacher Freedom Summit, a Republican teacher called Florida under the DeSantis administration Kamoutsas led as a "beacon of hope." The teacher asked if Kamoutsas will look to Trump to help or to spread Florida's legacy to "blue states." Kamoutsas "thanks God" for a U.S. Supreme Court decision upholding parental rights in education.

129.    Kamoutsas insulted the "all inclusive" bathroom options at the Washington, DC based conference. And said thankfully in Florida, "women are women and men are men. We don't mix that up."

130.    Kamoutsas also discussed "religious objections" to pronouns usage. He told the crowd, "forgive me" about my religious views, which would make folks in Denver or California "explode."

131.    Kamoutsas referred to himself as a "Bible thumper" and promoted more religious think tanks.

132.    Kamoutsas noted specifically showing bias against McMath, "After the immediate aftermath of the assassination of Charlie Kirk, I was appalled by what I was seeing educators post publicly. We have a teacher in Clay County, Florida, who posted when Charlie Kirk was assassinated at a school campus that, 'this wasn't the obituary I was hoping for, but it's a close second for me,' insinuating that the teacher actually wanted the President of the United States to be the individual who had been assassinated. Glorifying, celebrating, condoning a school shooting is not going to be tolerated in Florida. We do anticipate additional litigation as we fight back on this, but we're not afraid of it because we've done it before and we are going to always put students first in the state and we're going to lead by example."

133.    As Kamoutsas is in the role of Prosecutor, his comments are professionally inappropriate, but also an open warning that he will weaponize his office based on those who oppose the views he, Moms for Liberty and Turning Point share.

134.   Kamoutsas is mixing his personal beliefs and prosecuting them inappropriately under the Constitution and laws of the country and state of Florida, which is unquestionably biased and exercising unconstitutional use of authority.

## DUVAL COUNTY PUBLIC SCHOOLS

135.   Duval County Public Schools (hereinafter "DCPS" or "Duval Schools") oversees over 100,000 students in and around Jacksonville, Duval County, Florida.

136.   Duval County Public Schools is led by a seven-member board.

137.   The majority (four) of those seven members are members of, made a pledge to, or were endorsed by Moms for Liberty.

138.   The majority (four) of those seven members were wearing "Turning Point" supportive t-shirts during the school board meeting following Kirk's death at which McMath was discussed.

139.   One of those school board members, Vice Chairperson April Carney, appears in the complaint against McMath as the source of exhibits against McMath.

140.   Two of those school board members, Vice Chairperson April Carney and Chairperson Charlotte Joyce, openly advocated for the Turning Point and Moms for Liberty from the dais, handed down judgment on McMath in an official capacity and exercised their duties in a way which favored speech, chilled the opposite of that speech and created a fear among McMath, her supporters and other educators that

the DCPS is controlled by one political ideology and if you do not share it, you are subject to retaliation and/or limitation.

141.   According to the rules of DCPS's School Board, "Board Members do not engage in individual District personnel issues." See https://www.duvalschools.org/page/duval-county-school-board-policy-manual/. This was violated.

142.   Under 2.26(6)(a)(1), "Board Member Protocol, "Board members will act and dress professionally." Id. This was violated.

143.   Under 2.26(6)(a)(2), "Board members will handle all interactions with each other, the Superintendent, staff and the public with respect." Id. This was violated.

144.   Under 2.26(6)(a)(3), "Board members will refrain from responding to speaker comments or addressing the audience." Id. This was violated.

145.   Under 2.26(6)(a)(5), "Discussions shall be directed solely to the business currently under deliberation and the Chairperson reserves the right to halt discussions that do not apply to the business before the Board." Id. This was violated.

146.   Under 2.26(6)(c)(9), "During the Public Comment portion of the meeting, the time limitations for each speaker shall be as follows… if 41+ speakers have signed up to speak, each will be allotted one (1) minute. When there are

35

multiple speakers on the same issue, the Chairperson will indicate the Board's desire that the speakers designate 2 or 3 people to speak for the group." Id. This was violated.

147.    There are two designated ways to be heard during public comment:

a.    Under 2.26(6)(c)(4), "Speakers are required to fill out a speaker's card (including the speaker's full name, address, and other required fields) prior to speaking during the Public Comment portion of a meeting. Speaker cards may be accepted no earlier than one hour prior to the published start time for a meeting..." And,

b.    Under 2.26(6)(c)(5), "In lieu of speaking during public comment, members of the public may submit a designated card to waive in support or opposition of an agenda item. Cards to waive in support/opposition of an agenda item shall be accepted in the same manner as speaker's card as set forth in (2) above." Id. This was violated.

148.    For all speakers, under 2.26(6)(c)(8), Speakers must state their name for the record and what organization, if any, they represent." Id. This was violated.

149.    For all speakers, under 2.26(6)(c)(13), "Speakers will avoid the use of profane or vulgar language or personal attacks upon any individual." Id. This was violated.

150.   Each of these violations were one-sided promotions of speech they advocate while suppressing the side they find repugnant.

## OCTOBER 7, 2025 SCHOOL BOARD MEETING

151.   Each and every one of the above rules were violated at the October 7, 2025 school board meeting and have been violated since. The majority of the school board, named as Defendants herein, failed to provide enforcement of the rules, which allowed the subject school board meeting to become openly hostile, biased and intimidating if not an entire weaponization of DCPS.

152.   At the first DCPS school board meeting following Kirk's shooting, each and every one of those four endorsed members wore shirts emblazoned with, "This is the turning point."[22]

153.   These shirts feature intellectual property of Turning Point USA, Inc., the very entity founded by Charlie Kirk. It is worth noting Turning Point USA, Inc., also has sought trademarks for, "PLAYING OFFENSE TO WIN THE CULTURE WAR," "A BATTLE TANK, NOT A THINK TANK, "HEALING A SICK CULTURE," and, "WE ARE DOING THE WORK TO SAVE AMERICA."

154.   As such, there can be no confusion that this brand stands for preference of speech at the exclusion of its "sick" and needing "savior" counterpart.

---

[22] https://www.firstcoastnews.com/article/news/local/duval-county-school-board-members-turning-point-usa-shirts-backlash/77-815d45ef-11dd-4a65-a755-fa61c3d7b81c

155.    By wearing political messaging and then seeking to enforce and escalate that "side" of the message, it violated McMath and others First Amendment rights and the Rules of the Board.

156.    If it were simply incidental or accidental, one would forgive this unprofessional act. However, it was orchestrated such that the majority of the Board wore these shirts and doubled down with improper and unconstitutional use / abuse of power.

157.    The October 7, 2025 school board meeting had 76 speakers requesting to be heard. Because of the vast number of applicants, each was limited to one minute as required under 2.26(6)(c)(9).

158.    The majority of the speakers violated 2.26(6)(c)(13), which mandates, "Speakers will avoid the use of profane or vulgar language or personal attacks upon any individual."

159.    Despite not being an issue in any way on the agenda, most of the public comment was specifically designed to attack Hope McMath and other teachers who spoke out against Charlie Kirk.

160.    Even though 2.26(6)(c)(8) requires that speakers, "must state their name for the record and what organization, if any, they represent," many did not or were not asked. This also allowed for multiple members of Moms for Liberty to be heard in excess of the Rules. This was also ignored at the end of the meeting when

Vice Chairperson April Carney spoke individually while giving over six minutes to her anonymous ally.

161.    Many of the speakers who agreed with the Defendants' agenda, quickly spoke about division and persecution of the speech they did not agree with, including in unprofessional, if not violent, fashion. None of it was halted under 2.26(6)(a)(5) and personal attacks were freely allowed, but only of McMath and her allies, under 2.26(6)(c)(13). For instance:

a.      One of the first speakers, Josh Nathanson, praised the Board leadership, accused the minority members of the board of misconduct and asked, "How did this person (referring to Hope McMath) get hired?" and, "Is a teacher excusing an assassination as karma fit to teach in our schools." Nathanson and/or his spouse are Moms for Liberty members and did not identify same.

b.      A few speakers later, Blake Harper, brought up that he plans to exercise his "Constitutional Right of Individual Speech." Mr. Harper notes, "when you are employed by a company, you accept their rules and regulations. You don't get to make your own. And that is exactly what Hope McMath thinks she can do." Harper also is known to be a staunch advocate for Moms for Liberty and its agenda.[23]

c.      Joey Marmo started with, "What if I came up here and started making threats? What would happen to me?" And, added, "Think about how callous, cold

---

[23] https://eyeonjacksonville.com/targets-pornography-propaganda-and-proselytizing/

hearted and empty you must be to wish ill and death upon another human being. That's not free speech, that is bloodless murder." Mr. Marmo noted the taxes he pays, "to fund these animals teaching our children." And, "I want these sick lefty sickos defending this teacher to be reminded Charlie (Kirk) was a father…." And, "The biggest crime to me is sickos like this teacher keeping her job after making sick deranged comments regarding the death of Charlie Kirk." He then quotes Jesus, says, "I am Charlie Kirk" and "fire her." Marmo has been escorted out of School Board meetings in the past for obstreperous conduct.[24] He's donated and publicly supported Ms. Carney and the other Moms for Liberty elected candidates.

  d. Gordon Terry resumed the persecution of Ms. McMath by reading scripture and called those on the other side of him, "evil folk." Mr. Terry is known for placing political signs for staunch Republican candidates. He's donated and publicly supported Ms. Carney and other Moms for Liberty elected candidates.

  e. Natalie Dryer said she spoke "on behalf of Moms for Liberty." She said parents thank them for "exposing the District's secret gender transition plans." She referred to McMath's speech as "vile" and claimed Moms for Liberty could help solve the District's enrollment decline. She's donated and publicly supported Ms. Carney and other Moms for Liberty elected candidates.

---

[24] https://jaxtoday.org/2025/04/02/duval-school-board-removes-districts-first-challenged-book-identical/

162.   As speakers went on, those who shared the Turning Point views received warmer receptions by the Board than those who expressed concerns. They were thanked and welcomed. Counterpoints were more rudely treated or cut off.

163.   Pro Turning Point / Moms for Liberty speakers were more commonly allowed to finish thoughts, but those opposing their views were abruptly cut off as their time reached 1 minute.

164.   At the end of the meeting, <u>April Carney read one sole email she selected,</u> justifying the reading of the email falsely saying only "one voice" was often heard at meetings.

165.   Dozens of voices were actually heard, expressing plenty of views on both sides. Ms. Carney's use of the dais added further stigma sought to chill speech through rhetoric and falsehood and only escalate her side while calling the opposite repugnant and evil.

166.   Unlike every speaker who had to reveal their name and address, April <u>Carney kept the name (and address) on the email secret</u>. The secret e-mail was not introduced into the record.

167.   April Carney read from the unnamed person from 4:28.18 to 4:34.28- <u>over 6 minutes without interruption.</u> Not the one-minute others were limited to.

168.   Each step violated more Rules of the DCPS School Board and the majority sat silent as their preferred organization, Moms for Liberty, got even more time at the school board meeting.

169.   Even though the Board did not have McMath on any agenda, April Carney read the email with passion and emphasis, discussing how McMath was "excusing murder as karma," raised questions about McMath's mental health, insisted there were "red flags" prior to hiring McMath, claimed McMath handed out "blasphemous posters to District students," claimed McMath had "obvious lack of professional judgment," accused McMath of mocking children's religion, appealed to the superintendent that he must be "blown away" by McMath's actions, and otherwise excoriated McMath.

170.   These expressions cause McMath to be even more afraid for her livelihood and constitutional rights and violated the core Rules of the School Board while the majority of the Board, and the Superintendent, sat quiet.

171.   Carney then blamed public commentary and debate in School Board meetings for "so much political violence" in schools. She said, "this parent" speaks for thousands, but claims they "only hear one side."

172.   Carney concluded her closing argument taking about people "celebrating murder." This shows clear and imminent bias to McMath and any teacher or administrator daring to disagree.

173.    Other educators and students are taking notes that their speech is being chilled by such an openly biased -and even angry- display by DCPS leadership.

174.    DCPS School Board Chairperson Charlotte Joyce also took time at the end of the meeting to publicly heroize and memorialize Charlie Kirk. She noted that as she was watching Kirk's memorial, she wanted "to do something to remember Kirk." She noted she could have just used the word, "Freedom," but specifically chose, "This is the Turning Point" on the School Board Majority's t-shirts.

175.    These actions systemically suppress contrary protected viewpoints Plaintiff and those like her have a right to express, diminish her and other's willingness to participate at Board meetings and sends a message to others that the Board will publicly stigmatize you if you do not adhere to their beliefs by implementing a parade of their donors and fellow group members to call you evil, weaponize your speech or make anonymous complaints.

176.    Defendant's abuse of public participation and its own rules to chill free speech rights is not only a matter of different rules for different speech, but allowing open and obvious hostility towards members of our community.

## SOCIAL MEDIA POLICY

177. School Board Policy 6.84.D.1. Section 6.84 is entitled, "FRATERNIZATION AND COMMUNICATION WITH STUDENTS AND PARENTS."

178.   Based on the District's website, 6.84 was implemented on April 1, 1997.   See   https://www.duvalschools.org/o/dcps/page/chapter-6-human-resource-services. However, that does not tell the whole story.

179.   In 1997, websites like Facebook were restricted to college students. Social media was not a place where teachers and students comingled.

180.   The current published history of 6.84 fails to reference revisions on November 10, 2008, April 4, 2017, July 9, 2018, March 5, 2019 and May 6, 2025.

181.   As of July 9, 2018, the title was, "FRATERNIZATION WITH STUDENTS." Its sole purpose was to prevent improper relationships between adults and students. In 2018, the school board voted to change the named restricted parties from "Staff members" to "Authority figures." Each of the three paragraphs directly referenced prohibitions, "from dating, agreeing to date and/or having a sexual, romantic, lewd, or inappropriate relationship with any student…"

182.   In 2019, it was revisited again and, "Policy 6.84 is proposed to be amended to update the statutory language concerning prohibited conduct of soliciting or engaging in sexual conduct, a relationship of a romantic nature, or lewd conduct with, or date or agree to date a student."

183.   At the school board meeting on April 4, 2023, the "D.A. issue" was a key topic. The "D.A. issue" was systemic abuse by educators at Douglas Anderson

School of the Arts upon students over a prolonged period of time, which led to many teacher arrests.

184.    As a result, DCPS engaged in a media campaign where it's spokesperson, Laureen Ricks , told media DCPS changed a number of policies to, "address system weaknesses, prevent employee sexual misconduct, and protect students."    See   https://jaxtoday.org/2025/07/28/investigation-douglas-anderson-student-accusers-lacked-faith-in-schools-response/.

185.    On April 12, 2023, the school board was publicly reviewing the subject policy again to see if there were loopholes which contributed to the "D.A. issue" or a timely lack of response.

a.    Questions like, "There is a policy about texting students. Should it be under 6.84 also," were asked.

b.    It is also note, "Staff has been requested to pull any other policy that is related to the Douglas Anderson case."

c.    Another note from the meeting, "All policies related to Professional Standards and communication with students will be brought back to the next Policy Review Meeting."

186.    On May 1, 2024, the school board recommended 6.84 be implemented in the school system's commissioner's contract.

187.   At all material times, the purpose of 6.84 was designed to prevent inappropriate sexual and relationship encounters between students and adults.

188.   On the May 6, 2025 school board meeting, it was recommended, "Recommendation: That the Duval County School Board conduct a public hearing and adopt the recommended revisions to the following policies in School Board Manual Chapter 6: Policy 6.83 Employee Conduct and Policy 6.84 Fraternization with Students." The changes sought, "The changes recommended to the existing language reflect the priorities and values of the board and the district's constituent groups."

189.   A discussion was had among the school board members that, Board Members cannot be placed under this policy because it cannot be enforced. They are elected officials and co-equal. No one Board Member is over another Board Member." They Board protected themselves 7-0.

190.   However, the school board also wanted to add language to 6.84 to, "add that employees must maintain professionalism while on duty, and off, by adhering to the Principles of Professional Conduct for the Education Profession, as outlined in Florida Administrative Code, 6A-10.081."

191.   Florida Administrative Code, 6A-10.081 is called, "Principles of professional conduct for the education profession in Florida." However, some of the

principals were grounded in political ideology and the Moms for Liberty / Turning Point platforms. For instance:

    a.    Teachers cannot provide classroom instruction on sexual orientation or gender identity for PreK through 8th grade. For grades 9-12, such instruction is prohibited unless it is part of a required state curriculum or a, health lesson that parents can opt out of.

    b.    Educators restricted from use of personal titles and pronouns that do not correspond with a student's biological sex.

    c.    The code prohibits entering restrooms designated for the opposite sex.

192.    Other violations Defendants claimed were allegations McMath "cursed" on social media. Despite DCPS claiming 6.84 prohibits cursing, 6.83 very clearly states, "The use of profanity or abusive language, whether written, verbal or reproduced, or other abusive behavior **on School Board property or in the presence of students** by School District employees shall be prohibited." This clearly was not the case. Thus, this is another example of the DCPS Defendants violating their own standards to arbitrarily and capriciously infringe on McMath's private speech. She was disciplined for this double standard.

193.    The FDOE also cited the "principals" from Rule 6A-10.081, referenced above. Specifically, it claimed under (a)(1) McMath failed to, "make reasonable effort to protect the student from conditions harmful to learning and/or to the

student's mental and/or physical health and/or safety." No student is alleged to have heard, saw or participated in McMath's private posts and they were done on her personal time off of school grounds.

194.  The FDOE also cited the "principals" from Rule 6A-10.081, referenced above. Specifically, it claimed under (b)(1) McMath failed to, "take reasonable precautions to distinguish between personal views and those of any educational institution or organization with which the individual is affiliated." This was a Facebook post. Ms. McMath restricted students from her Facebook. It was not referencing the school, students, district or education. This rule as cited by FDOE violates the First Amendment and is overbroad if it is going to be used in this manner.

195.  The Department of Education also cites a statutory violation under Section 1012.795(1), Florida Statutes. Under subsection (g), the Department of Education Defendants claim, "Upon investigation, (McMath) has been found guilty of personal conduct that seriously reduces that person's effectiveness as an employee of the district school board." They recently provided the file. There was no such investigation. There was no such evidence. This is a persecution of speech.

196.  Similarly, under Section 1012.795(1), Florida Statutes, subsection (j), the Department of Education Defendants claim, " (McMath) Has violated the Principles of Professional Conduct for the Education Profession prescribed by State

Board of Education rules." This is overbroad, unsupported and not supported whatsoever by the file. This is a persecution of speech.

197.    School Board Policy 6.84.D.1 states, "District employees are expected to be professional, civil and appropriate in all their communications with students, parents, fellow employees and the public, including in their electronic and online communications." This limits regulation to communication between teacher, students and parents, so is narrowly tailored.

198.    Section D then basically adds overbroad and unlimited subjective discretion upon DCPS and its agents to police all communication, 24 hours a day and 7 days a week, based on an undefined moral code.

199.    DCPS ventured far beyond the boundaries clearly explained by the United States Supreme Court and 11th Circuit Court of Appeals noting, the "expectation applies to the posting of publicly accessible communications and material (collectively referred to as "Material") on the Internet, where it is available for viewing by members of the public, including students and parents. For the purpose of this rule, websites, other electronic media and online Material are deemed to be publicly accessible if they can or may be viewed by District students, parents or the general public." See School Board Policy 6.84.D.1.

200.    Regulating speech which can be viewed, may be viewed or is available for viewing 24/7/365 is facially unconstitutional and is subject to the problems

McMath has experienced- weaponization of political speech by people who have taken an oath to a non-profit determined to wage a war on her and others who stand on her side of the political aisle.

## EDUCATORS AND THE FIRST AMENDMENT

201.   First Amendment's protections extend to public school teachers (and students), "neither of whom shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022).

202.   A teacher's right to speak is not without limits. One reason is that "[i]n addition to being [a] private citizen[]," a teacher is "also [a] government employee[] paid in part to speak on the government's behalf and convey its intended messages." *Id.*

203.   In *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286 (11th Cir. 2025), the 11th Circuit Court of Appeals announced in order to resolve the private-citizen/government-employee tension, it, "employ(s) a two-step framework grounded in the Supreme Court's decisions in *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).

204.   At step one, the *Wood* court noted, the employee must show that in expressing herself she is (or was) speaking both (a) as a citizen—rather than in her

capacity as a government employee—(b) about a matter of public—rather than private—concern. *See Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1160 (11th Cir. 2015).[25]

205.   If the employee survives step one, she must then demonstrate, at step two, that her interest in speaking outweighs the state's interests in promoting the efficient delivery of public services. *See Pickering*, 391 U.S. at 568.

206.   The *Wood* Court distinguished the facts of the in-classroom debate over pronouns with a football coach kneeling in prayer after a came in U.S. Supreme Court case of *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507 (U.S. 2022).

207.   The *Kennedy* Court found the Free Exercise and Free Speech Clauses of the First Amendment protect an individual engaging in a personal religious observance from government reprisal; the Constitution neither mandates nor permits the government to suppress such religious expression. The U.S. Supreme Court noted, the timing and circumstances of Kennedy's prayers (during the postgame period when coaches were free to attend briefly to personal matters and students were engaged in other activities) confirm that Kennedy did not offer his prayers

---

[25] Katie Wood is a transgender educator who teaches at a public high school in Florida. She challenged a 2023, Florida statute (Fla. Stat. § 1000.071(3)), which prohibits public school employees from providing students with their preferred personal titles or pronouns if they do not correspond to the employee's biological sex at birth. The court reasoned that interacting with students during class time is a teacher's official duty and thus not protected speech.

while acting within the scope of his duties as a coach much like McMath was not offering political commentary on social media to educate or subjugate her students.

## GOOSE VERSUS GANDER: INCONSISTENCY ABOUNDS AT DCPS

208.   In further support of the fact Defendants seem solely focused on censuring speech which does not meet their leadership's or their donor's political agenda, many other educators in Duval County post vastly more offensive contend and do not receive any discipline or investigation. One example was brought forward in the original Complaint and that teacher has since put her content as "private" and evades investigation even through her content was readily visible for years.

209.   Plaintiff can go through thousands of teachers and show equally offensive posts, reposts and private conversations. All equally must be protected or not protected at all- the U.S. Constitution and Bill or Rights are not malleable.

210.   Even the Defendant school board members named herein regularly post expletives and offensive commentary to no concern, discipline or ridicule.

## CAGGIANO VERSUS DUVAL COUNTY PUBLIC SCHOOLS

211.   Defendants are well area of these issues and have been involved in adverse court rulings on more extreme First Amendment cases than this one.

212.   In 2022, Sandalwood High School math teacher, Thomas Caggiano, was suspended following what was referred to my media as, "problematic racist and anti-LGBTQ posts on Facebook."[26]

213.   In what can be characterized as the opposite basis of Hope McMath's persecution, Thomas Caggiano refused to use a transgender student's pronouns.

214.   Caggiano received inclusion training following the incident, but "continued to speak out against the transgender community and post memes about other marginalized groups."

215.   Caggiano was further accused of lying during the investigation and even accused media of hacking into his social media accounts as a defense.

216.   In his posts — which were often graphic or explicit — Caggiano shared memes disparaging marginalized groups, including photos showing a figure in a pink skirt with long blond hair standing in front of a urinal or making fun of transgender celebrities like Caitlyn Jenner. A post written by Caggiano himself (not shared from someone else) called transgender people seeking to use public restrooms that line up with their gender "insanity."

217.   In his defense, Caggiano said, "sharing my belief on my personal Facebook that there are only two genders that correspond with the biological sex is

---

[26] https://www.jacksonville.com/story/news/education/2020/12/02/sandalwood-teacher-suspended-slew-transphobic-anti-lgbtq-facebook-posts-duval-county/3788872001/.

not 'phobia'" and said that memes are a way to make political statements with a "touch of humor," but "sometimes the humor is in the eye of the beholder."

218.    Unlike the above unanimous love from McMath's students, Former students of Caggiano spoke with DCPS and said they "dreaded" going to his class because of his in-class issues and felt "exhausted" daily because of his behavior in the classroom. None of these comments have ever been made about Plaintiff.

219.    One parent told DCPS investigators, "From Mr. Caggiano's postings on Facebook, it is clear that he is racist and hateful toward LGBTQ individuals and as that racism caused and continues to cause immeasurable harm to anyone who is not white (not only physically, but also psychologically)." None of these comments have ever been made about Plaintiff.

220.    Caggiano was suspended and appealed. He argued that his suspension and reprimand violated his free speech rights. The court agreed, writing, "Turning to the law, the contours of teacher free speech are governed by the principles of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny whose framework created a balance between the constitutional rights of a teacher who comments upon matters of public interest as a citizen and the government's interest in the efficient delivery of the public educational services it provides through its teachers, administrators, and staff."

221.    And, the court noted, "In Pickering, a teacher sent a letter that was critical of the school board's operations and budgetary decisions, which was published in the local newspaper. Id. at 564. Pickering was fired and a hearing was held, resulting in the board concluding that sufficient evidence existed to support his termination. Id. at 566−67. The Illinois state courts concluded that Pickering's letter was "detrimental to the best interests of the schools" and rejected the claim that his dismissal infringed upon his First Amendment rights to speak on a matter of public concern."

222.    The Caggiano Court wrote, "Because the two reposts involved a matter of public concern, the next question is whether they presented a risk to the School Board's interest in running an efficient workplace that is free of disruption. On this point, no evidence was presented that the two reposts had any meaningful impact on the School Board's operations or that they created any disruption." And, "The posts occurred outside of the school, on Caggiano's own time and computer, and amounted to little more than harmless political chitchat; they collectively amounted to the proverbial hill of beans."

223.    There is no evidence which has ever been presented or is known to Plaintiff that her reposts had any meaningful impact on the School Board's operations or that they created any disruption whatsoever.

224.    Despite the different content, lies and a far more sensation fact pattern, the state appellate court overseeing this very jurisdiction and school district, "REVERSED with instructions to strike suspension and reprimand from employment records and to reinstate pay and related benefits from time of suspension."

## DAMAGES AND ATTORNEY'S FEES

225.    Because of Defendants' actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated violations of her rights in the future.

226.    Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

227.    Plaintiff has retained John Phillips and Phillips, Hunt & Walker, LLC, as her attorneys to represent her in this action.

228.    Defendants are obligated to pay Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988.

229.    Section 1988 allows a prevailing party to recover "a reasonable attorney's fee as part of the costs," 42 U.S.C. § 1988(b). A plaintiff is a prevailing party when she is "awarded some relief on the merits" that "materially altered the

legal relationship between the parties." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1376 (11th Cir. 2022).

## COUNT I
## RIGHT OF FREE SPEECH,
## U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
## (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO)

230.   Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

231.   First Amendment protections extend to public speech at school board meetings, by operation of the Fourteenth Amendment.

232.   A school board meeting at which the public is allowed to speak is a designated public forum limited to discussing school operation and governance. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983); *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017).

233.   The public comment period at BPS school board meetings is a limited public forum for Duval County residents, taxpayers, students and parents to discuss matters of public concern related to the school district.

234.   "Although a limited public forum may rightly limit speech at the forum to only certain content, the First Amendment does not tolerate viewpoint-based discrimination against speech within the scope of the forum's subject matter.

235.   Viewpoint discrimination occurs when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Barrett*, 872 F.3d at 1225 n.10 (internal quotation marks and citations omitted).

236.   All of Plaintiff's and her supporter's public speech at Board meetings is fully protected by the Free Speech Clause of the First Amendment.

237.   The Duval County Public School System School Board majority, led by its Vice Chairman April Carney and Chairman Charlote Joyce specifically and obviously favored one side of speech over the other at the October 7, 2025 meeting and other school board meetings.

238.   As alleged herein, school board leadership represented DCPS while visibly supporting Charlie Kirk and Turning Point by wearing politically branded shirts stating, "This is the Turning Point."

239.   It then proceeded to allow attacks of McMath, where Moms for Liberty members and supporters

a.     Attack a DCPS educator by calling her, "callous, cold hearted and empty," while entirely mischaracterizing her words, as if she "wished death upon another human being."

b.     Allowed McMath and other educators to be called, "animals teaching our children," "sick lefty sickos," by supporters and donors to their political campaigns.

58

c.    Allowed McMath and other educators to be called, "evil folk," conspire about conspiracy theories such as the non-existent, "District's secret gender transition plans" by supporters and donors to their political campaigns.

d.    Allowed those who shared the Turning Point or Moms for Liberty affiliations to receive warmer receptions, thank you's and a few seconds extra to close their thoughts while contrary opinions were cut off.

e.    Allowed the Vice Chair April Carney to violate all equal time and name disclosure restrictions, falsely justifying the reading of a lengthy email, saying only "one voice" was often heard at meetings.

f.    Allowed the Vice Chair April Carney to read an email from her Moms for Liberty ally for 6 minutes, which attacked and used Moms for Liberty and Turning Point divisive talking points, falsely claiming McMath was "excusing murder as karma," raised questions about McMath's mental health, insisted there were "red flags" prior to hiring McMath, claimed McMath handed out "blasphemous posters to District students," claimed McMath had "obvious lack of professional judgment," accused McMath of mocking children's religion, appealed to the superintendent that he must be "blown away" by McMath's actions, and otherwise excoriated McMath.

g.    After the email, Vice Chairman April Carney violated the First Amendment even further on her own personal rant openly stigmatizing one side of

public commentary and debate saying it was to blame for "so much political violence" in schools. She said, "this parent" speaks for thousands, but claims they "only hear one side."

h.    Vice Chairman April Carney further ranted from the dais about people "celebrating murder."

240.   These  Defendants censored Plaintiff and her supporter's speech openly using every way- imbalance of time, imbalance of treatment, stigmatism, threat, invocation of violence, t-shirts and propaganda.

241.   As-applied against Plaintiff and her supporters, the escalation and promotion of one side of the issue (the Moms for Liberty / Turning Point Platform) while extreme stigmatization and discrimination (anything contrary thereto) violated and continue to violate Plaintiff's First Amendment right of free speech by impermissibly discriminating against speech on the basis of its viewpoint.

242.   As-applied against Plaintiff, the leadership's defacto biased implementation and use of a discriminatory public participation policy violate Plaintiff's First Amendment rights because these prohibitions are not reasonable in light of the public comment period's purpose and rules.

243.   By bias enforcement of public participation against speakers that make statements favorable to Defendants and/or by enforcing the public participation against Plaintiffs and threatening them and associating them with evil, religious

damnation, murder, and crimes, Defendant DCPS through its board member(s), officer(s), director(s), managing agent(s), or employee(s) under color of law, deprived and continue to deprive Plaintiff's right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution.

244.    Accordingly, Plaintiff (and anyone not supporting the Moms for Liberty / Turning Point Platform) are chilled, restricted, and damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to nominal damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays for the following relief:

a.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT II
## RIGHT TO PETITION, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
## (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO)

245.    Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

246.    "The right to petition the government for a redress of grievances is one of the most precious of the liberties safeguarded by the Bill of Rights, and is high in the hierarchy of First Amendment values. The right to petition the government for redress of grievances is such a fundamental right as to be implied by the very idea of a government, republican in form." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288-89 (11th Cir. 2019) (internal punctuation marks and citations omitted).

247.    "A petition may consist of a 'personal grievance addressed to the government' and may be an oral grievance." *Floyd v. Cty. of Miami-Dade*, No. 17-CV-21709, 2017 U.S. Dist. LEXIS 76631 at *9 (S.D. Fla. May 18, 2017) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 394 (2011) and citing *Mack v. Warden, Loretto FCI*, 839 F.3d 286, 299 (3d Cir. 2016)).

248.    Defendants not only sought to suppress McMath's Rights to Petition, Protest and exercise her rights of free expression by restricting and punishing her private use of social media, but also entirely stigmatized her, her message and any support of her at school board meetings.

249.    The public comment period at school board meetings is a forum that enables people to exercise their fundamental First Amendment right to petition their elected government officials.

250.   Plaintiff's public speech on social media, and school board meetings both personally by her and in support of her is fully protected by the First Amendment right to petition the government for a redress of grievances.

251.   Instead, DCPS and school board leadership have implemented a public participation process with such bias and stigmatization that McMath and other educators and supporters fear public comment, even to defend herself /themselves.

252.   As-applied against Plaintiff and any attempt to support her, as implemented and restricted, the district's public participation policy violates Plaintiffs' First Amendment right to petition by impermissibly discriminating against their petitions on the basis of their viewpoint.

253.   As-applied against Plaintiff and any attempt to support her, as implemented and restricted, the district's public participation policy violates Plaintiff's First Amendment rights because these prohibitions are not reasonable in light of the public comment period's purpose.

WHEREFORE, Plaintiff prays for the following relief:

a.      That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT III
## VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION DEPRIVATION OF FREEDOM OF SPEECH PURSUANT TO 42 U.S.C. § 1983
## (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO)

254.    Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

255.    Duval County Public Schools School Board Policy 6.84.D.1 goes far beyond the boundaries of the First Amendment as it regulates private speech, and more important private political speech outside of the classroom.

256.    6.84.D.1 states its, "expectation applies to the posting of publicly accessible communications and material (collectively referred to as "Material") on the Internet, where it is available for viewing by members of the public, including students and parents. For the purpose of this rule, websites, other electronic media and online Material are deemed to be publicly accessible if they can or may be viewed by District students, parents or the general public." See School Board Policy 6.84.D.1.

257.    Plaintiff brings this claim, as 6.84.D.1 violates the Free Speech Clause of the First Amendment to the U.S. Constitution, applicable to the states through the Fourteenth Amendment to the U.S. Constitution.

66

258.   Plaintiff understands the need to regulate her speech rights while at work, including in the classroom and during work hours. However, none of the speech here was in any way in the course, scope, time, location or process of her employment as an educator.

259.   Plaintiff was not and is not instructing students, encouraging better performance, or engaging in any other speech that Defendant paid and pays Plaintiff to produce as a teacher.

260.   Plaintiff's speech was not and is not government speech subject government control just because students may, theoretically, be able to see it, hear it or stumble upon it.

261.   Plaintiff's speech implicated and implicates a matter of public concern for purposes of the First Amendment.

262.   Plaintiff's strong interest in being allowed to express Plaintiff's protected political opinions outweighs any government interest, if any, in preventing Plaintiff from doing so.

263.   Defendants who restricted, demeaned, sanctioned and is actively stigmatizing this speech are person(s) within the meaning of 42 U.S.C. § 1983. 215.

264.   By enforcing or threatening to enforce 6.84.D.1, Defendants have and are acting under color of state law within the meaning of 42 U.S.C. § 1983.

265.    By enforcing or threatening to enforce 6.84.D.1, Defendant have and are subjecting Plaintiff to the deprivation of Plaintiff's right to freedom of speech secured by the First and Fourteenth Amendments.

WHEREFORE, Plaintiff prays for the following relief:

a.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT IV**
**FIRST AMENDMENT VIOLATION – RETALIATION**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

266.   Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

267.   Defendants each and/or collectively acted under the color of law to deprive McMath of her First Amendment Rights guaranteed by the U.S. Constitution.

268.   McMath's social media posts are purely public and purely protected speech.

269.   It is well established that public employees, including teachers, do not lose their First Amendment rights merely because of their occupation. *See e.g.*, *Pickering v. Board of Education*, 391 U.S. 563 (1968). Speech outside the scope of ordinary job duties is protected under the First Amendment, especially when it relates to a matter of public concern.

270.   Further, these Defendants were well aware of the recent *Caggiano* ruling in this very District censuring this type of action.

271.   In posting the political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff spoke as a private citizen.

272.   Defendants took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

273.   Defendants' actions directly deprived Plaintiff of her First Amendment rights.

274.   Defendants adverse actions were in direct response to Plaintiff's protected political speech.

275.   Plaintiff's personal and political posts were the motivating factors in Defendants' decisions to take retaliatory action against Plaintiff.

276.   Defendants' response to Plaintiff's expression was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

277.  Defendants' actions have chilled Plaintiff's speech.

278.  The actions taken by each Defendant named herein, and the rules and policies on which such actions are purportedly based, directly violate McMath's First Amendment rights and chill the right to future expression. Such actions, rules, and polices, should be enjoined to prevent further irreparable injury and a further chilling effect on McMath and others.

280.  Defendants' actions were based on their own objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

281.  Defendants' decision to discipline, shame and potentially terminate Plaintiff's employment was motivated by each / their opposition to Plaintiff's viewpoint, which the Defendant has repeatedly labeled as offensive and contrary to its "values."

282.  Plaintiff is likely to succeed on the merits of her claims.

283.  Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

a.     That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.     That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.     That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.     That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.     That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT V**
**<u>FIRST AMENDMENT VIOLATION - CONTENT</u>**
**<u>AND VIEWPOINT DISCRIMINATION</u>**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

284.   Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

285.   Plaintiff is uncertain as to her rights and remedies following the suspension, discipline, reassignment and potential termination of her employment in apparent violation of the First Amendment to the United States Constitution.

286.   In posting the political comment concerning the death of Mr. Kirk and other issues of public concern, Plaintiff spoke as a private citizen.

287.   Defendants took adverse action against Plaintiff — specifically to publicly shame her, suspend, discipline, reassign and potentially terminate her from employment.

288.   Defendant's actions directly deprived Plaintiff of her First Amendment rights.

289.   Plaintiff's interest in speaking as a private citizen on matters of public concern necessarily outweighs Defendants' interests in advancing their own content- or viewpoint-discrimination or preventing Plaintiff from doing so.

290.   Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs Defendants' interest in content and viewpoint discrimination or imposing a heckler's veto.

291.   Defendants shamed, insulted, accused, suspended, reassigned and instituted termination proceedings against Plaintiff's employment because of Defendants opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

292.   Defendants never asserted that Plaintiff's political speech would upset the orderly operations of the classroom, nor were such disruptions reasonably foreseeable given the limited publication of Plaintiff's private speech, the lack of knowledge by her co-workers or students, Plaintiff's position and job responsibilities, and the content of Plaintiff's speech.

293.   In fact, the sole known complainant is in no way affiliated with her classroom, but instead a political entity with a history of weaponizing litigation.

294.   Plaintiff's speech did not, in fact, disrupt her classroom operations or harm anyone.

295.   Public reaction to speech is never a content-neutral basis for regulation. See *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

296.   The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); see also *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

297.   Defendants' decisions to stigmatize, reassign, suspend and/or institute termination proceedings against Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

298.   Defendants' decisions to terminate Plaintiff's employment was motivated by their own opposition to Plaintiff's viewpoint.

299.   Plaintiff is likely to succeed on the merits of her claims.

300.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

a.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.    That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT VI
## FLA. STAT. § 1003.4505 – PROTECTION OF SCHOOL SPEECH
### (AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)

301.    Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

302.    In 2010, the Florida legislature enacted the statute regarding "Protection of School Speech," which states:

*District school boards, administrative personnel, and instructional personnel are prohibited from taking affirmative action, including, but not limited to, the entry into any agreement, that infringes or waives the rights or freedoms afforded to instructional personnel, school staff, or students by the First Amendment to the United States Constitution, in*

*the absence of the express written consent of any individual whose constitutional rights would be impacted by such infringement or waiver.* Fla. Stat. § 1003.4505

303.  Plaintiff's freedom of speech was and continues to be infringed.

304.  Plaintiff further alleges that she was subject to affirmative action in that she was harassed, retaliated against and subjected to adverse action.

305.  Plaintiff seeks all remedies available at law and in equity under Fla. Stat. § 1003.4505.

306.  Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

a.      That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.      That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT VII**
**<u>RIGHT OF FREE SPEECH,</u>**
**<u>U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983</u>**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

307.   Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

308.   The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

309.   The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or initiatives, even if that speech does so in ways that many people may find unpleasant. Allegations of hurt feelings, real or specious, do not justify censorship of public speech.

310.   First Amendment protections extend to social media and out of classroom political opinions by educators.

311.   In this very jurisdiction, DCPS has been warned on the supremacy of the First Amendment. See *Caggiano v. Duval County Public Schools,* discussed above.

312.    By implementing and enforcing polices which as directly violative of McMath's rights, Defendants, under color of law, deprive Plaintiff of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution.

313.    Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

314.    Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

a.    That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.    That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.    That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.     That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.     That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.     That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.     That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.     That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.     That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

**COUNT VIII**
**VAGUENESS, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983**
**(AGAINST DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, ANTHONY RICARDO, FLORIDA DEPARTMENT OF EDUCATION and ANASTASIOS KAMOUTSAS, AS COMMISIONER OF EDUCATION)**

315.   Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

316.   Because notice is the first element of due process, the Fourteenth Amendment's Due Process Clause prohibits the enforcement of vague laws. The First Amendment likewise forbids the enforcement of laws that are so vague as to chill protected speech.

317.   The prohibitions, polices and persecutions of McMath's speech deemed "abusive," or "obscene" are each unduly vague, serving only to authorize Defendants' arbitrary censorship of speech they dislike.

318.   Further, Defendants refuse to provide any explanation, complaint or due process whatsoever, even failing to respond to Public Record Requests.

319.   By enforcing these provisions, Defendants, under color of law, deprive Plaintiff of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, are entitled to nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

320.   Plaintiff has suffered past and future economic losses, past and future non-economic losses, loss of ability to earn in the future, emotional and mental distress and other damages as a direct result of Defendant's actions.

WHEREFORE, Plaintiff prays for the following relief:

a.      That this Court enter a judgment declaring that the Defendant's decision to suspend and/or terminate Plaintiff's employment violated the First Amendment because it was content-based;

b.      That this Court enter a judgment declaring that Defendant's decisions to suspend and institute termination proceedings against Plaintiff's employment violated the First Amendment because it was viewpoint-based;

c.      That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her prior position and responsibilities;

d.      That this Court enter a preliminary and permanent injunction removing any and all references to discipline or wrongdoing from her employment file;

e.      That this Court enter a preliminary and permanent injunction forever enjoining Defendant and the various agents and employees of Defendants from disciplining Plaintiff in the future for posting the specific political statement at the center of this lawsuit in the exercise of her First Amendment rights;

f.      That this Court enter a judgment for benefits and losses sustained by Plaintiff;

g.      That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

h.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

i.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

j.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT IX
## MALICIOUS PROSECUTION BY MOMS FOR LIBERTY AND/OR MOMS FOR LIBERTY DUVAL

321.    Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

322.    Defendants Moms for Liberty and/or Moms for Liberty Duval instituted an investigation and resultant legal proceedings against Plaintiff.

323.    Defendants Moms for Liberty and/or Moms for Liberty Duval sent the complaint to the media in order to further bolster its complaint and weaponize it against Plaintiff.

324.    Defendants Moms for Liberty and/or Moms for Liberty Duval put pressure on the Defendants named herein to give priority to their complaint or otherwise require McMath defend herself.

325.   The actions of Defendants Moms for Liberty and/or Moms for Liberty Duval have caused McMath economic and non-economic harm, as well as the need to retain attorneys.

326.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was based in falsehood.

327.   Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was not supported by any first-hand evidence of in-class room misconduct.

328.   Defendants Moms for Liberty and/or Moms for Liberty Duval have a history of boasting about using lawsuits to shut down political opponents and those who do not agree with their views.

329.   Defendants Moms for Liberty and/or Moms for Liberty Duval have no reasonable ground or a lack of sufficient evidence to justify the actions they caused.

330.   Defendants Moms for Liberty and/or Moms for Liberty Duval acted with an improper or wrongful motive.

331.   The action was commenced by the Florida Board of Education and a second one was commenced by Duval County Public Schools.

332.   McMath suffered harm, such as financial loss, humiliation, or emotional distress, as a result of the prior proceedings.

WHEREFORE, Plaintiff prays for the following relief:

a    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

b.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

c.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

d.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

e.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

### COUNT X
### TORTIOUS INTERFERENCE BY MOMS FOR LIBERTY AND/OR MOMS FOR LIBERTY DUVAL

333.    Plaintiff realleges the facts set forth in Paragraphs 1 through 229 and incorporates those facts into this Count by reference.

334.    Defendants Moms for Liberty and/or Moms for Liberty Duval have falsely claimed McMath has improperly violated the law or school policies.

335.    Defendants Moms for Liberty and/or Moms for Liberty Duval provided the falsehoods to media, Ben Becker with Action News.

336.    Defendants Moms for Liberty and/or Moms for Liberty Duval sent the complaint to the media in order to further bolster its complaint and weaponize it against Plaintiff and get her removed from her job as an educator.

337.    These actions were premised in falsehood and designed through malice.

338.    The defendant(s) acted *intentionally* to disrupt the relationship between McMath and her employer and/or used coercion or inducement to cause her contract and employment to be I jeopardy and possibly terminated.

339.    The defendant's actions were unjustified; and

340.    McMath was under contract with Duval County Public Schools, a fact known to Defendants.

341.    The actions of Defendants Moms for Liberty and/or Moms for Liberty Duval have caused McMath economic and non-economic harm, as well as the need to retain attorneys.

342.    Defendants Moms for Liberty and/or Moms for Liberty Duval instituted a complaint which was based in falsehood, lies and defamation and did so for malice.

343.    Defendants Moms for Liberty and/or Moms for Liberty Duval have a history of boasting about using lawsuits to shut down political opponents and those who do not agree with their views.

344.    Defendants Moms for Liberty and/or Moms for Liberty Duval acted with an improper or wrongful motive, to maliciously harm McMath and suppress speech.

345.    McMath has suffered harm, such as financial loss, humiliation, or emotional distress, as a result of the defamation.

WHEREFORE, Plaintiff prays for the following relief:

a.    That this Court enter a judgment for benefits and losses sustained by Plaintiff;

b.    That this Court award Plaintiff economic, non-economic and/or nominal damage as proven by Plaintiff;

c.    That this Court enter a judgment for pre-judgment and post-judgment interest at the highest lawful rate;

d.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees; and

e.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## JURY TRIAL DEMANDED

WHEREFORE, Plaintiff, HOPE McMATH, demands a jury trial against Defendants, DUVAL COUNTY PUBLIC SCHOOLS, CHARLOTTE JOYCE, APRIL CARNEY, MELODY BOLDUC, REGINALD BLOUNT, ANTHONY

RICARDO, FLORIDA DEPARTMENT OF EDUCATION, ANASTASIOS

KAMOUTSAS, AS COMMISIONER OF EDUCATION, MOMS FOR LIBERTY

INC, and MOMS FOR LIBERTY – DUVAL.


Law Office of Phillips, Hunt & Walker


 **/s/ John M. Phillips**
JOHN M. PHILLIPS, ESQUIRE

Florida Bar Number: 0477575

 **/s/ William K. Walker**
WILLIAM WALKER, ESQUIRE

Florida Bar Number: 0085552

660 Park Street

Jacksonville, FL 32204

(904) 444-4444

(904)508-0683 (facsimile)

Attorneys for Plaintiff

jmp@floridajustice.com

william@floridajustice.com

anne@floridajustice.com