# Exhibit B

STATE OF FLORIDA
EDUCATION PRACTICES COMMISSION

DR. HENRY MACK, as
Commissioner of Education,

Petitioner,

DOAH Case No. 25-5786PL
EPC Case No. 250853TC

v.

HOPE MCMATH,

Respondent.
________________________________/

**PETITIONER'S EXCEPTIONS TO AMENDED RECOMMENDED ORDER**

Petitioner, Dr. Henry Mack, as Commissioner of Education, under section 120.57(1)(k), Florida Statutes, and Florida Administrative Code Rule 28-106.217, files these Exceptions to the Amended Recommended Order entered by the Administrative Law Judge ("ALJ") on September 21, 2026 ("RO"), and, in support thereof, states:

**PRELIMINARY STATEMENT**

1. The material facts are not in dispute. On September 10, 2025, the day Charlie Kirk was assassinated, Respondent wrote and published on her Facebook account the following message: "Karma's a bitch – and she heard all your speeches when you proudly proclaimed that you didn't give a shit about other people's lives." (RO ¶ 8; Stip. (e)(9); T. 55:1-56:2.) She admitted that the "you" in the message was Charlie Kirk. (T. 56:3-7.) She also shared an image of E. Jean Carroll holding the severed head of the President of the United States. (RO ¶ 8; T. 56:19-57:21.) Anyone could view her postings on Facebook and Instagram. Her accounts expressly identified her as a Duval County teacher, but did not include a disclaimer that her opinions were not necessarily shared or endorsed by the school board. (RO ¶ 6.)

2. The ALJ nonetheless recommended that the Commission dismiss every charge. He did not reach that conclusion by finding different facts. Rather, he applied legal tests that the governing statute and rules do not contain. He measured "public disgrace" by whether District students and employees complained, even though the rule asks about the public. He read mandatory factors out of the gross immorality rule. He required a "persuasive explanation" for the District's decision to take Respondent out of the classroom, even though he found that the reassignment was one of the sanctions that followed the District's investigation and the parties stipulated that it was made "in connection with the investigation of this matter." And he rewrote the precaution rule to require proof of what a reasonable observer would think.

3. Petitioner accepts the ALJ's findings of historical fact. These exceptions challenge the ALJ's conclusions of law and his interpretation of the statutes and rules the Commission is charged with applying. When the correct legal standards are applied to the facts the ALJ found and the facts the parties stipulated, each charged violation is established. Petitioner therefore asks the Commission to reject the challenged conclusions, find that Respondent committed the charged violations, and impose an appropriate penalty. In the alternative, if the Commission concludes that applying the correct legal standards requires findings of fact the ALJ did not make, Petitioner asks the Commission to remand this matter for the ALJ to make those findings.

4. The following citation forms are used. "RO ¶ __" refers to a numbered paragraph of the RO, and "RO at __" refers to a page of the RO. "T. __:__" refers to the page and line of the transcript of the July 27, 2026, final hearing, filed with the Division of Administrative Hearings on August 19, 2026. "Stip. (e)(__)" refers to the admitted facts in the parties' Joint Pre-Hearing Stipulation filed July 22, 2026. "P. Ex. __" and "R. Ex. __" refer to Petitioner's and Respondent's exhibits admitted at the final hearing.

**STANDARD OF REVIEW**

5. Section 120.57(1)(l), Florida Statutes, governs the Commission's review. The Commission "may reject or modify the conclusions of law over which it has substantive jurisdiction and interpretation of administrative rules over which it has substantive jurisdiction." § 120.57(1)(l), Fla. Stat. When it does so, it "must state with particularity its reasons" and "must make a finding that its substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected or modified." *Id.* The Commission may not reject or modify findings of fact unless it first determines, from a review of the entire record, that the findings were not based upon competent substantial evidence or that the proceedings on which they were based did not comply with the essential requirements of law. *Id.*

6. The Commission has substantive jurisdiction over the conclusions challenged here. The Legislature has charged the Commission with taking final action on complaints against educator certificates. §§ 1012.795(1), 1012.796(6)-(7), Fla. Stat. Every challenged conclusion construes section 1012.795(1) or one of the State Board of Education rules that give it content: Rule 6A-10.081, which prescribes the Principles of Professional Conduct for the Education Profession, and Rule 6A-10.083, which defines gross immorality for purposes of section 1012.795(1)(d). The Commission applies those provisions in every case that comes before it. *See Gootee v. Sch. Bd. of Monroe Cnty.*, 201 So. 3d 115, 117 (Fla. 3d DCA 2015) (explaining that an agency's "authority to reject or modify the ALJ's recommended order regarding issues of law and the application of agency rules is not confined by any such presumption" of correctness).

7. Petitioner recognizes the limits of that authority. The First District has held that whether the facts found in a recommended order constitute a violation of a disciplinary rule is ordinarily "a question of ultimate fact which the agency erred in rejecting without adequate

explanation." *Langston v. Jamerson*, 653 So. 2d 489, 491 (Fla. 1st DCA 1995); *see also McKinney v. Castor*, 667 So. 2d 387, 389 (Fla. 1st DCA 1995). Petitioner does not ask the Commission to reweigh the evidence or to substitute its view of the facts for the ALJ's. But labels do not control. As the Second District put it, "we must be guided by the true nature of the finding, not its title." *Pillsbury v. Dep't of Health & Rehab. Servs.*, 744 So. 2d 1040, 1041 (Fla. 2d DCA 1999); *see also Battaglia Props., Ltd. v. Fla. Land & Water Adjudicatory Comm'n*, 629 So. 2d 161, 164 (Fla. 5th DCA 1993). What a statute or rule requires is a question of law, decided de novo. *See* Art. V, § 21, Fla. Const. That constitutional command governs the ALJ; it does not diminish the Commission's authority. As the First District has explained, article V, section 21 requires administrative hearing officers "to make de novo legal conclusions without deference to an agency's preferred interpretation," but "[s]ection 120.57(1)(l) expressly authorizes agencies to reject an ALJ's legal conclusions and substitute the order with its own." *Agency for Health Care Admin. v. Murciano*, 381 So. 3d 1283, 1287 (Fla. 1st DCA 2024). "The conclusions of law in a final order are the conclusions of the agency, not the ALJ's." *Id.* at 1287-88. When an ALJ adds an element to a rule, reads a mandatory factor out of it, or measures a statutory term against the wrong benchmark, the error is one of law. The agency may correct that error while accepting every finding of historical fact. *See Baptist Hosp., Inc. v. Dep't of Health & Rehab. Servs.*, 500 So. 2d 620, 623-24 (Fla. 1st DCA 1986) (affirming final order that adopted the hearing officer's findings of fact but rejected his interpretation of the agency's rule).

8. This case presents exactly that kind of dispute. As in *Gootee*, "[t]he salient facts are undisputed. The parties differ sharply on the legal consequences flowing from those facts." 201 So. 3d at 117. Each exception below is built on that distinction. Each accepts the ALJ's findings of historical fact, identifies the legal standard the ALJ applied, identifies the standard the text

requires, and shows that the ALJ's own findings, the stipulated facts, and undisputed testimony satisfy the correct standard. If the Commission concludes that applying the correct standard requires findings the ALJ did not make, the proper course is to remand for the ALJ to make them rather than to make supplemental findings in the Final Order. *See Fla. Power & Light Co. v. State, Siting Bd.*, 693 So. 2d 1025, 1026-27 (Fla. 1st DCA 1997). Remand allows the ALJ, who heard the witnesses, to make those findings under the correct legal standard. That is preferable to leaving in place a recommendation built on the wrong one.

**Exception No. 1 (RO ¶¶ 30, 32): The ALJ measured "public disgrace" by the wrong audience, treated a non-exhaustive list as a checklist, and never applied most of the definition of gross immorality.**

9. Rule 6A-10.083(1) defines gross immorality as follows:

> [C]onduct that is inconsistent with the standards of public conscience and good morals. It is conduct that is serious, rather than minor in nature, and that constitutes a flagrant disregard for proper moral standards. Further, the conduct brings the individual concerned or the education profession into public disgrace or disrespect and impairs the individual's service in the community.

Fla. Admin. Code R. 6A-10.083(1). The definition has four parts. The conduct must be inconsistent with the standards of public conscience and good morals. It must be serious rather than minor. It must reflect a flagrant disregard for proper moral standards. And it must bring the educator or the profession into public disgrace or disrespect and impair the educator's service in the community.

10. The ALJ addressed only the last part. He concluded that there was "no competent, substantial evidence to support a finding Ms. McMath's conduct brought her or the education profession into public disgrace or disrespect," and he gave one reason: "Mr. Bennett and Mr. Kosac fielded no complaints from School District students or employees." (RO ¶ 30.) That is the wrong benchmark. The rule asks whether the conduct brought the educator or the profession into *public* disgrace or disrespect. The public is not limited to the students and employees of one school

district. Whether students and co-workers lodged complaints may bear on the separate question of impaired service. It does not answer whether the conduct disgraced the profession in the eyes of the public. Florida courts have framed this element in terms of notoriety, asking whether the conduct "was sufficiently notorious so as to disgrace the teaching profession." *McNeill v. Pinellas Cnty. Sch. Bd.*, 678 So. 2d 476, 477 (Fla. 2d DCA 1996).

11. Measured against the correct benchmark, the ALJ's own findings establish the element. He found that the Department received complaints from the public about Respondent's postings. (RO ¶ 15.) He found that the District received a complaint, investigated, and sanctioned Respondent, including by reassigning her to a position with no teaching duties. (RO ¶ 12.) And he quoted the testimony of Respondent's own principal that, although students, teachers, and parents were not talking about the posts at school, "[t]hey were aware because it was in the news." (RO ¶ 17.) The undisputed testimony is to the same effect. The District received emails from members of the public stating that Respondent had been unprofessional in posting the karma statement and the severed-head image. (T. 76:4-17.) One came from a parent in the District. (T. 80:2-8.) The posts drew significant news coverage and came up in connection with a School Board meeting. (T. 143:11-25.) And the Department's investigative report records that the Department, the Commissioner, and the Office of Professional Practices Services "received numerous complaints regarding Ms. McMath's social media postings." (R. Ex. 1, Investigative Report at 3.) That is public disgrace by any measure. *See Adams v. State Prof'l Practices Council*, 406 So. 2d 1170, 1172 (Fla. 1st DCA 1981) (relying on evidence that the educators' conduct "received widespread newspaper publicity" and that "many people were aware of the facts involved").

12. The ALJ also treated two non-exhaustive provisions of the rule as limits. He noted that the postings were not a felony or first degree misdemeanor, a falsification of certification

documents, or a test-security violation under subsection (2), and he concluded that no reasonable person could equate them with the offenses listed in subsection (5). (RO ¶¶ 30, 32.) But subsection (2) operates "[w]ithout limiting the conduct here defined," and it lists conduct that "will prompt review for gross immorality." Fla. Admin. Code R. 6A-10.083(2). Subsection (5) creates a presumption of gross immorality for certain sexual and child-related offenses. *Id.* R. 6A-10.083(5). Neither subsection marks the outer boundary of gross immorality. That conduct falls outside those lists says nothing about whether it satisfies the definition in subsection (1).

13. Finally, the ALJ never addressed the first three parts of the definition. (RO ¶¶ 30-32.) The post itself satisfies them. Start with its words. On the day Charlie Kirk was assassinated, Respondent told him, before the public, that "[k]arma's a bitch – and she heard all your speeches when you proudly proclaimed that you didn't give a shit about other people's lives." (RO ¶ 8; T. 55:23-56:7.) The post does not simply comment on a public figure. It ties his killing to his speeches. And Respondent testified that the post was aimed at Mr. Kirk and was "a warning to lots of people who could be included in such a statement." (T. 56:5-7.)

14. Gross immorality is measured against "the standards of public conscience and good morals." Fla. Admin. Code R. 6A-10.083(1). For an educator, those standards include the profession's own. The Principles of Professional Conduct describe an educator who "values the worth and dignity of every person, the pursuit of truth, devotion to excellence, acquisition of knowledge, and the nurture of democratic citizenship." *Id.* R. 6A-10.081(1)(a). Petitioner does not contend that subsection (1) is itself a basis for discipline. But it describes the moral standard the public expects of those it entrusts with its children. Teaching students that ideas are answered with ideas is the heart of a teacher's job. A teacher who tells the public that a man's killing was karma

for his speeches, and warns others who might be "included in such a statement," repudiates that standard. That is true whatever the victim's politics, and whatever the teacher's.

15. So the conduct is inconsistent with the standards of public conscience and good morals. It is serious, not minor, because it addressed the assassination of a public figure and was published to the world under Respondent's name and her identity as a Duval County teacher. (RO ¶¶ 6, 8.) And it reflects a flagrant disregard for proper moral standards. Respondent's later explanation that she did not mean to celebrate the killing (RO ¶ 9) does not change what she published, and the ALJ made no finding that the post means anything other than what it says. Determining the moral standards expected of Florida educators is a judgment "infused with overriding policy considerations" that belongs to the Commission. *Pillsbury*, 744 So. 2d at 1042; *see also Baptist Hosp.*, 500 So. 2d at 624.

16. The Commission should reject RO ¶¶ 30 and 32 and substitute a conclusion that Petitioner proved Count I by clear and convincing evidence. That substituted conclusion is as or more reasonable than the ALJ's because it applies all four parts of the rule's definition, measures public disgrace against the public reaction, and reads subsections (2) and (5) as the rule itself describes them. In the alternative, if the Commission concludes that whether the conduct satisfies the first three parts of the definition is an ultimate finding of fact that the ALJ must make, *see Langston*, 653 So. 2d at 491, it should remand for the ALJ to make that finding under the complete definition.

**Exception No. 2 (RO ¶ 31): The ALJ misread the deliberation factor and failed to consider two factors the rule requires him to consider.**

17. Rule 6A-10.083(4) lists nine factors that "shall be considered in determining whether an act or omission rises to the level of gross immorality or moral turpitude." Fla. Admin. Code R. 6A-10.083(4). The ALJ addressed three of them: violence, deliberation, and the audience.

(RO ¶ 31.) His treatment of deliberation misreads the rule, and he did not consider two of the factors at all.

18. Factor (d) is "[t]he educator's deliberation, premeditation, or contemplation of an act." *Id.* R. 6A-10.083(4)(d). The ALJ concluded that "[t]he social media postings did not reflect any deliberation, premeditation, or contemplation of any act by Ms. McMath." (RO ¶ 31.) That reading asks whether the postings revealed a plan to do something else. But the act the factor refers to is the conduct under review, and the conduct under review here is the writing and publishing of the karma statement and the sharing of the image. The ALJ found that Respondent wrote the message and shared the image. (RO ¶ 8.) She testified that she wrote the statement, posted it to her public Facebook account, and has never taken it down. (T. 55:8-56:18.) She testified that she saw the artist's post and shared it to her public Facebook stories, where anyone who visited could see it. (T. 57:10-21.) Subsection (6) confirms the point. It provides that "[a]ccidental, negligent or reckless conduct alone" does not meet the definition of gross immorality. Fla. Admin. Code R. 6A-10.083(6). Deliberate conduct is the opposite of accidental conduct, and factor (d) exists to distinguish the two. Read as the ALJ read it, factor (d) would be irrelevant in every case that does not involve a plan to commit some further act.

19. The ALJ did not consider factor (c), "[t]he educator's malice or cruelty," or factor (f), "[t]he harm, injury or insult to the victim." *Id.* R. 6A-10.083(4)(c), (f). The RO's analysis does not address either one. (RO ¶¶ 30-32.) The rule does not make those factors optional; it says they "shall be considered." A conclusion reached without considering mandatory factors is not a conclusion reached under the rule. And both factors bear directly on a public statement, published on the day of a man's murder and directed at him, that "[k]arma's a bitch" and that "she heard all

your speeches when you proudly proclaimed that you didn't give a shit about other people's lives." (RO ¶ 8; T. 55:23-56:7.)

20. The ALJ also relied on his determination that "Ms. McMath persuasively testified that students were not her intended audience." (RO ¶ 31.) Petitioner does not challenge that credibility determination. But none of the nine factors asks whom the educator meant to reach, and the ALJ found that anyone could view Respondent's postings. (RO ¶ 6.)

21. The Commission should reject RO ¶ 31 and conclude that factors (c), (d), and (f) weigh in favor of a determination of gross immorality. That conclusion is as or more reasonable than the ALJ's because it gives factor (d) its natural meaning, reads factor (d) together with subsection (6), and considers every factor the rule requires. In the alternative, if the Commission concludes that weighing those factors requires findings the ALJ did not make, it should remand for the ALJ to consider factors (c) and (f) and to apply factor (d) correctly.

**Exception No. 3 (RO ¶ 34 and n.4): The ALJ required direct proof of reduced effectiveness, looked for disruption only inside the classroom, disregarded his own finding and a binding stipulation, and measured effectiveness from the wrong vantage point.**

22. Section 1012.795(1)(g) authorizes discipline of an educator who, "[u]pon investigation, has been found guilty of personal conduct that seriously reduces that person's effectiveness as an employee of the district school board." § 1012.795(1)(g), Fla. Stat. The statutory measure is effectiveness "as an employee of the district school board." It is not the absence of complaints from a particular classroom, and it is not a principal's willingness to rehire.

23. **First, the ALJ required direct proof.** He concluded that "[t]here is no evidence that the social media postings at issue seriously reduced Ms. McMath's effectiveness as a School District employee," relying on the absence of complaints from District teachers, administrators, and students and on the absence of students claiming that their education was disrupted. (RO ¶ 34.)

But Florida courts have long held that impaired effectiveness may be inferred from the nature and notoriety of the conduct. In *Adams*, the First District relied on evidence that the educators' conduct "received widespread newspaper publicity," that "many people were aware of the facts involved," and that the conduct "had seriously impaired their abilities to remain effective teachers." 406 So. 2d at 1172. The Fifth District has explained that "impaired effectiveness in the school system can be inferred from certain misconduct," and that the inference may be drawn "even though no parent, student or co-worker was called as a witness to say so." *Purvis v. Marion Cnty. Sch. Bd.*, 766 So. 2d 492, 498 (Fla. 5th DCA 2000); *see also Walker v. Highlands Cnty. Sch. Bd.*, 752 So. 2d 127, 128 (Fla. 2d DCA 2000) (explaining that a teacher's "ineffectiveness in the school system may be inferred"). *Purvis* arose in the same posture as this case. The ALJ there concluded that the teacher's misconduct was not so serious as to impair his effectiveness and recommended reinstatement. The school board rejected that conclusion "as a matter of law," and the Fifth District affirmed. 766 So. 2d at 494-98. The court reasoned that the impaired-effectiveness language may be "a descriptive term that refers to the degree of seriousness of the misconduct which would warrant dismissal, not a requirement that the School Board conduct surveys to determine how citizens view the conduct." It held that, at least in that case, the question did not require "testimony of actual impairment from students or parents." And it confirmed that the school board "is entitled to reject or modify conclusions of law reached by the administrative law judge." *Id.* at 498. The RO does not address, and cannot be squared with, this line of authority.

24. **Second, the ALJ looked for disruption only inside the classroom.** A school district is more than one classroom, and the record shows that Respondent's postings disrupted the District's operations as her employer. The postings generated public complaints to the District and to the Department. (RO ¶ 15; T. 76:4-17; T. 89:11-90:5.) They drew significant news coverage

and came up in connection with a School Board meeting. (T. 143:11-25.) The District opened a formal investigation, substantiated it, and imposed discipline. (RO ¶ 12; T. 72:22-75:3.) Its investigator determined that the postings had the potential to disrupt District operations. (RO ¶ 12.) The District then removed Respondent from contact with students, reassigned her to a position with no teaching duties, and kept her there for the rest of the school year. (RO ¶ 12; Stip. (e)(4); T. 75:4-24; T. 142:23-143:3.) According to the Department's investigative report, the removal came on September 12, 2025, within two days of the post. (R. Ex. 1, Investigative Report at 3.) An educator whom the District will not place in front of students is not an effective employee of the district school board. That is the harm the statute addresses. Principal Feagins's testimony that the posts never came up inside Douglas Anderson (RO ¶ 17) speaks to one school's hallways. It does not speak to the District.

25. Respondent will likely rely on *Tenbroeck v. Castor*, 640 So. 2d 164 (Fla. 1st DCA 1994), and *Baker v. Sch. Bd. of Marion Cnty.*, 450 So. 2d 1194 (Fla. 5th DCA 1984). Neither case fits. In *Tenbroeck*, the only evidence of impaired effectiveness was an expert's opinion based on publicity about a marriage that was "not a crime or a violation of any rule or statute." 640 So. 2d at 168. In *Baker*, the school board relied on publicity about charges of which the teacher had been exonerated. 450 So. 2d at 1195. Here, Respondent admits the conduct. That conduct is itself charged as a violation of the Principles of Professional Conduct (Exception No. 4), and the District investigated it and substantiated the charge. (RO ¶ 12; T. 72:22-25; T. 79:4-5.) And the proof of reduced effectiveness is not publicity alone. The proof is what the District had to do in response. After investigating and determining that the postings had the potential to disrupt District operations, the District removed Respondent from the classroom, and she did not teach for the balance of the school year. (RO ¶ 12; Stip. (e)(4).)

26. **Third, the ALJ disregarded his own finding and a binding stipulation.** He concluded that "the Record lacks any persuasive explanation for why the School District took that action," and he stated in a footnote that "[t]here was no explanation as to why the School District transferred Ms. McMath to a non-teaching position." (RO ¶ 34; RO at 7 n.4.) But the ALJ himself found that the reassignment was imposed once the District investigated Respondent's postings. (RO ¶ 12.) And the parties stipulated that "[b]eginning in September 2025, Respondent was reassigned to the District's Art Resource Center in connection with the investigation of this matter and has not taught students in a classroom since that reassignment." (Stip. (e)(4).) "A stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court." *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 4 (Fla. 1971). The rule applies with full force in chapter 120 proceedings: "absent a showing of fraud, misrepresentation or mistake, stipulations are binding on ... administrative agencies participating in administrative proceedings." *Delgado v. Agency for Health Care Admin.*, 237 So. 3d 432, 437 (Fla. 1st DCA 2018) (quoting *Marion Cnty. v. Dep't of Juv. Just.*, 215 So. 3d 621, 626-27 (Fla. 1st DCA 2017)). The reason for the reassignment was established by the ALJ's own finding and by the parties' stipulation. The District received a complaint about Respondent's postings, conducted an investigation, removed Respondent from the classroom, and did not return her for the rest of the school year.

27. **Fourth, the ALJ measured effectiveness from the wrong vantage point.** He relied on Principal Feagins's wish to have Respondent "back" and on his own conclusion that Respondent "is still capable of being an effective classroom teacher." (RO ¶ 34.) But the statute asks about Respondent's effectiveness as an employee of the district school board, and the ALJ found that the District, not Principal Feagins, was responsible for her assignment. (RO ¶ 18.)

Principal Feagins's testimony on that point was conditional: "If she's reinstated, I think that she's an asset to the school." (T. 132:12-14.) He confirmed that the reassignment was the District's decision. (T. 143:1-6.) And he acknowledged that Respondent's performance evaluations predate September 2025 and that he has not observed her teaching since the District removed her. (T. 144:1-8.) A principal's hiring preference is not the statutory measure. Nor is an educator's capability in the abstract. The question is whether the conduct seriously reduced her effectiveness as an employee of the district, and the District properly concluded that it did.

28. **Fifth, the ALJ relied on an unadopted recommended order.** The ALJ quoted a recommended order in a Sumter County school-board employment case, DOAH Case No. 25-5430TTS, which he described as "final order pending." (RO ¶ 34.) A recommended order is "the official recommendation of an administrative law judge ... for the final disposition of a proceeding." § 120.52(15), Fla. Stat. It becomes agency action only if the agency adopts it. *See* § 120.57(1)(l), Fla. Stat.; *Murciano*, 381 So. 3d at 1287-88. And even on its own terms, the Sumter County recommendation involved a superintendent who "had to deal with a handful of inquiries." (RO ¶ 34.) This case involves public complaints to two agencies, significant news coverage, a School Board meeting, and a substantiated District investigation.

29. Nor does the First Amendment framework Respondent invokes, which neither the ALJ nor the Commission may adjudicate, require proof of actual classroom disruption. The Supreme Court has said that it does "not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 152 (1983). Courts give "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994)

(plurality opinion). And the Eleventh Circuit has held that "[t]he government's legitimate interest in avoiding disruption does not require proof of actual disruption." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015). Even *Caggiano*, on which Respondent relies, framed the question as whether the school board had shown "any risk or actual disruption of its operations." *Caggiano v. Duval Cnty. Sch. Bd.*, 403 So. 3d 1081, 1086 (Fla. 5th DCA 2025). The ALJ's insistence on proof of classroom disruption finds no support even there.

30. The Commission should reject RO ¶ 34 and the portion of footnote 4 stating that there was no explanation for the reassignment, which is contradicted by the ALJ's own finding in RO ¶ 12 and by the parties' binding stipulation, and it should substitute a conclusion that Petitioner proved Count II by clear and convincing evidence. That conclusion is as or more reasonable than the ALJ's because it applies the controlling appellate authority on inferred impairment, gives effect to the ALJ's own finding and the parties' stipulation, and measures effectiveness as the statute does, from the standpoint of the district school board. In the alternative, if the Commission concludes that applying the correct standard requires findings the ALJ did not make, it should remand for the ALJ to make them.

**Exception No. 4 (RO ¶ 39): The ALJ rewrote the precaution rule to require proof of what a reasonable observer would conclude.**

31. Rule 6A-10.081(2)(b)1. requires an educator to "take reasonable precautions to distinguish between personal views and those of any educational institution or organization with which the individual is affiliated." Fla. Admin. Code R. 6A-10.081(2)(b)1. The duty is framed in terms of the educator's conduct: she must take reasonable precautions. The rule says nothing about proof that anyone was confused, and nothing about what a reasonable observer might conclude.

32. The ALJ concluded otherwise. He reasoned that Petitioner "did not present any evidence indicating that a reasonable person might conclude that Douglas Anderson and/or the

School District shared the sentiments expressed in Ms. McMath's social media postings"; that the postings "appeared on Ms. McMath's personal social media accounts rather than any social media accounts maintained by Douglas Anderson or the School District"; and that "there is no evidence indicating that anyone could reasonably conclude that Ms. McMath's sentiments were shared by her employers." (RO ¶ 39.) Both rationales rest on a misreading of the rule.

33. **The reasonable-observer test is not in the rule.** The ALJ correctly recited that disciplinary statutes and rules "must be construed in terms of their literal meaning." (RO ¶ 23.) Strict construction resolves genuine ambiguity in the licensee's favor. It does not authorize a tribunal to add an element that the text does not contain. A tribunal is "without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms." *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984) (quoting *Am. Bankers Life Assurance Co. of Fla. v. Williams*, 212 So. 2d 777, 778 (Fla. 1st DCA 1968)). The same principle governs an unambiguous rule. The ALJ's test limits the rule's express terms by converting a duty of precaution into a requirement that Petitioner prove a particular public perception.

34. **The personal-account rationale reads the rule out of existence.** The rule addresses an educator's personal views. Statements on the District's own accounts would be the District's statements, and there would be nothing to distinguish. The rule matters precisely when an educator speaks personally while identified with her school. That Respondent posted on her personal accounts is the premise of the rule, not a defense to it.

35. **Reasonableness does not excuse the absence of any precaution.** Respondent may answer that "reasonable" precautions depend on the risk of confusion, and that the ALJ was simply measuring that risk. The answer does not save the RO. Whatever the right amount of precaution in a given case, the risk here was of Respondent's own making. She chose to publish to the world

from accounts that identified her as a Duval County teacher. (RO ¶ 6.) Having attached her employer's name to her speech, she took no step at all to separate her views from her employer's. (T. 51:24-52:9; T. 60:24-61:3.) A standard of reasonable precautions may excuse imperfect ones. It cannot make the absence of any precaution reasonable. Nor does the ALJ's finding that the posts did not purport to speak for the school (RO ¶ 11) change the analysis. A post that does not claim to speak for the school has not thereby distinguished the teacher's views from the school's. The rule requires the latter.

36. **Under the correct standard, the undisputed facts establish the violation.** The ALJ found that Respondent's accounts noted that she was employed as a Duval County teacher, that her postings could be viewed by anyone, and that there was "no disclaimer announcing that her expressed opinions are not necessarily shared or endorsed by the School District." (RO ¶ 6.) Respondent twice admitted that she placed no disclaimer on either account, explaining that "to do that, you would have to do it on every individual post." (T. 51:24-52:9; T. 60:24-61:3.) The District's investigator, who did not follow Respondent, could see her posts, saw that they identified her as a Duval County public school teacher, and saw no disclaimer. (T. 71:9-72:21.) The District substantiated its investigation in part because the posts do not reflect the District's views. (T. 73:6-18.) Respondent's practice of telling students not to follow her (RO ¶ 7) addresses who may see her posts. It does nothing to distinguish her views from her employer's for the students, parents, and members of the public who do see them. Respondent took no precaution of the kind the rule requires.

37. The Commission should reject RO ¶ 39 and substitute a conclusion that Petitioner proved Count V by clear and convincing evidence. That conclusion is as or more reasonable than

the ALJ's because it applies the rule as written and does not add an element the State Board of Education did not adopt.

**Exception No. 5 (Count III; Recommendation): Count III follows from Count V.**

38. Section 1012.795(1)(j) authorizes discipline of an educator who "[h]as violated the Principles of Professional Conduct for the Education Profession prescribed by State Board of Education rules." § 1012.795(1)(j), Fla. Stat. The ALJ recognized that Counts IV and V identify the principles on which Count III rests. (RO ¶ 35; T. 7:23-8:9.) Rule 6A-10.081(2) provides that "[v]iolation of any of these principles shall subject the individual to revocation or suspension of the individual educator's certificate, or the other penalties as provided by law." Fla. Admin. Code R. 6A-10.081(2). If the Commission sustains Exception No. 4, it should conclude that Petitioner proved Count III.

**Exception No. 6 (Recommendation): The Commission should suspend Respondent's educator certificate for five years, followed by probation.**

39. The ALJ recommended dismissal and therefore recommended no penalty. If the Commission rejects the conclusions addressed above, section 1012.796(7) requires it to enter a final order "imposing one or more of the following penalties," which include suspension of a certificate and probation subject to conditions the Commission may specify. § 1012.796(7)(b), (d), Fla. Stat. The Commission may suspend an educator certificate "for up to 5 years." § 1012.795(1), Fla. Stat.

40. The Commission's disciplinary guidelines provide a range of probation to revocation for gross immorality, Fla. Admin. Code R. 6B-11.007(2)(d)1.; a range of probation to revocation for personal conduct that seriously reduces effectiveness, *id.* R. 6B-11.007(2)(g); and a range of reprimand to revocation for violation of Rule 6A-10.081(2)(b)1., *id.* R. 6B-

11.007(2)(j)10. A five-year suspension falls within each range. Determining the appropriate penalty is a core function of the Commission. "As long as the statute under which a professional agency operates provides guidelines for imposing penalties, the agency complies with section 120.57(1)(b)10, and the increased penalty falls within the guidelines established by its statute, a professional board or agency has the discretion to increase the recommended penalty." *Crim. Just. Standards & Training Comm'n v. Bradley*, 596 So. 2d 661, 663 (Fla. 1992). Because the ALJ recommended dismissal, any penalty the Commission imposes is treated as an increase over the recommended penalty. *See Prysi v. Dep't of Health*, 823 So. 2d 823, 824-26 (Fla. 1st DCA 2002). The Final Order therefore should reflect the Commission's review of the complete record and state its reasons with particularity, citing the record. § 120.57(1)(l), Fla. Stat. Petitioner requests that the Final Order expressly adopt these exceptions and incorporate them. A final order "includes all materials explicitly adopted in it." § 120.52(7), Fla. Stat. Adopting the exceptions satisfies the statutory requirement. *See Phillips v. Bd. of Dentistry*, 884 So. 2d 78, 80 (Fla. 4th DCA 2004); *Castella v. Stewart*, 285 So. 3d 980, 985, 989 (Fla. 3d DCA 2019) (affirming enhanced Commission penalty where each panel member confirmed reading the entire record).

41. The aggravating factors in Rule 6B-11.007(3) support a five-year suspension. **Severity of the offense.** Respondent's conduct was public and deliberate, and it was directed at a man on the day of his murder. (RO ¶ 8; T. 55:8-56:7.) *See* Fla. Admin. Code R. 6B-11.007(3)(a). **Actual knowledge.** Respondent received training on the Principles of Professional Conduct, signed an acknowledgment that she had read them and would abide by them, received training on the use of social media as it relates to those principles, and was aware of District Policy 6.84. (Stip. (e)(5); T. 52:10-53:10.) *See id.* R. 6B-11.007(3)(k). **Refusal to correct or stop the violation.** The karma post remains on Respondent's public page, her accounts remain public, and she continues

to post on them. (T. 46:22-47:2; T. 56:13-18.) *See id.* R. 6B-11.007(3)(m). **Actual damage.** The postings generated public complaints to the District and the Department and significant news coverage, and they led the District to remove Respondent from the classroom for the balance of the school year. (RO ¶¶ 12, 15; Stip. (e)(4); T. 143:11-25.) *See id.* R. 6B-11.007(3)(g). **Deterrence.** A meaningful penalty will make clear to Florida educators that the Principles of Professional Conduct apply to public statements made while identified as an educator. *See id.* R. 6B-11.007(3)(h).

42. Petitioner acknowledges the mitigating factors. Respondent has not previously been disciplined by the Commission, and she has a long record of service as an arts educator. (T. 117:12-20; T. 130:15-132:1; R. Exs. 43, 44.) *See* Fla. Admin. Code R. 6B-11.007(3)(e), (f). Those factors do not outweigh the aggravating factors. The conduct was deliberate, public, and serious. It was committed by an educator trained on the very standards she disregarded. And it has never been corrected.

43. Petitioner therefore requests that the Commission suspend Respondent's educator certificate for five years from the date of the Final Order and, upon her employment after the suspension in any public or private position requiring a Florida educator's certificate, place her on probation for three employment years with the conditions set forth in section 1012.796(7)(d)1.-6., Florida Statutes, including completion of a course in education ethics approved by the Commission. If the Commission sustains fewer than all of Petitioner's exceptions, Petitioner requests that the Commission impose the penalty within the applicable guideline ranges that it determines is appropriate.

**Exception No. 7 (RO at 3; RO ¶¶ 14, 16, 30, 34): The Final Order should correct two scrivener's errors.**

44. The Final Order should correct the following errors. First, the RO spells the name of the Chief of the Department's Office of Professional Practices as "Kosac" (RO ¶¶ 14, 16, 30, 34); the correct spelling is "Kosec." (T. 87:23-24.) Second, the Preliminary Statement omits Respondent's Exhibits 43 and 44, which were admitted for mitigation purposes only. (RO at 3; T. 150:25-151:6.)

WHEREFORE, Petitioner requests that the Commission grant these exceptions and enter a Final Order that:

A. Rejects paragraphs 30, 31, 32, 34 (including the portion of footnote 4 addressed in Exception No. 3), and 39 of the RO and the Recommendation, and substitutes the conclusions set forth above;

B. Finds that Respondent violated sections 1012.795(1)(d), (g), and (j), Florida Statutes, and Florida Administrative Code Rule 6A-10.081(2)(b)1.;

C. Suspends Respondent's Florida educator's certificate for a period of five years from the date of the Final Order;

D. Upon Respondent's employment after the suspension in any public or private position requiring a Florida educator's certificate, places Respondent on probation for three employment years with the conditions set forth in section 1012.796(7)(d)1.-6., Florida Statutes, including completion of a course in education ethics approved by the Commission;

E. Corrects the scrivener's errors identified in Exception No. 7;

F. Expressly adopts these exceptions and incorporates them into the Final Order; and

G. In the alternative, to the extent the Commission concludes that applying the correct legal standards requires findings of fact the ALJ did not make, remands this matter to the Division

of Administrative Hearings for the ALJ to make those findings under the legal standards set forth above.

Respectfully submitted,

*/s/ Michael Barrett*
Michael Barrett
Florida Department of Education
Interim General Counsel
325 West Gaines Street
Tallahassee, FL 32399
Phone No.: (850) 245-9396
Email Address: Michael.Barrett@fldoe.org
Florida Bar No.: 1010908
Counsel for Petitioner

*/s/ Bonnie Wilmot*
Bonnie Wilmot
Florida Department of Education
Deputy General Counsel
325 West Gaines Street
Tallahassee, FL 32399
Phone No.: (850) 245-9428
Email Address: bonnie.wilmot@fldoe.org
Florida Bar No.: 29822
Counsel for Petitioner

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Education Practices Commission, Lisa M. Forbess, Executive Director, via e-mail at epc@fl-epc.org, and furnished via e-mail to John M. Phillips, Esquire, counsel for Respondent, at jmp@floridajustice.com, on October 6, 2026.

*/s/ Michael Barrett*
Michael Barrett